Karen STRAUSS, Plaintiff,

v.

MICROSOFT CORPORATION,
Defendant.

No. 91 Civ. 5928 (SWK).

United States District Court,
S.D. New York.

Feb. 22, 1993.

Vladeck, Waldman, Elias & Engelhard by Julian R. Birnbaum, New York City, for plaintiff.

Sullivan & Cromwell by John F. Cannon and Julie B. Crockett, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

In this employment discrimination action involving two claims of gender discrimination, defendant Microsoft Corporation ("Microsoft") moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting it partial summary judgment with respect to that part of the Complaint in which plaintiff Karen Strauss ("Strauss") seeks relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq., and the New York State Human Rights Law § 290 et seq., for Microsoft's refusal to promote her to the position of technical editor of the *Microsoft Systems Journal* (the "Journal"). Strauss opposes the motion. For the reasons set forth below, Microsoft's motion is denied.

### BACKGROUND [1]

Microsoft founded the Journal in 1986. The purpose of the Journal is to reach computer software developers, informing and instructing them about Microsoft computer products such as software operating systems, applications products, programming languages, and other Microsoft systems. In March 1987, the Journal began publishing on a bi-monthly basis. Although Microsoft is based in Redmond, Washington, the Journal is produced and published in New York City.

Beginning in March 1988, the Journal's staff consisted of a publisher/editor, a technical editor and his assistant, a production editor and her two assistants, an art director and her assistant, a circulation manager, an office manager, a receptionist, and a part-time intern.

Jonathan L. Lazarus ("Lazarus") began as the Journal's publisher/editor in November 1986. Strauss, a woman, began her employment at the Journal on March 14, 1988, as an assistant to the technical editor at that time, Tony Rizzo ("Rizzo"). Her starting salary was $18,500 per year. Strauss's educational background includes a high school diploma and some college credits. Additionally, prior to her employment at the Journal, Strauss had various experience both with computers and in publishing. In the computer field, Strauss worked as a computer consultant at New York University, wrote and edited a computer user manual, and programmed in various computer languages. Her publishing experience included work at three newspapers as a photographer and darkroom technician, and assistant editing for the *Washington Square News,* a local New York newspaper.

Rizzo and Strauss worked together on five issues of the Journal between May 1988 and January 1989. Their tasks included tracking the latest software development, finding appropriate topics for the Journal, scheduling, arranging all aspects of the technical review of Journal articles, and aiding the staff with technical issues. In November 1988, as a result of her "very helpful" performance at the Journal, Strauss received a $1,500 bonus, a salary increase to $21,000, and options on two thousand shares of Microsoft stock.

In February 1989, Rizzo resigned from his position as technical editor of the Journal. Rizzo continued to assist the Journal for a short time in a part-time capacity, however, in order to complete various work for the Journal and allow Lazarus time to find a replacement. Shortly thereafter, Lazarus began searching for Rizzo's replacement. According to Strauss, in April 1989, and on

1. These facts are adopted in part from the parties' statements of facts provided pursuant to Local Civil Rule 3(g), the parties' affidavits, and the exhibits attached thereto. The facts are undisputed except where noted.

four other occasions between May and July 1989, she asked Lazarus for a promotion to the vacant technical editor position.[2] Instead of promoting her, on April 14, 1989, Lazarus promised Strauss a title change and salary increase as of August 1989, which would be retroactive to May 1, 1989. In keeping with this promise, on August 1, 1989, Strauss was promoted to the associate editor position with an accompanying salary increase of $6,000 and a $2,750 bonus.

In July 1989, Lazarus prepared an advertisement expressing the Journal's interest in hiring a technical editor. In the interim, Strauss performed many duties of the technical editor in order to compensate for Rizzo's resignation from the Journal. These duties included selecting writers, assigning articles, following up with authors on structure, content, and technical accuracy of articles, and reviewing and defining layouts.

In September 1989, Lazarus hired Salvatore Ricciardi ("Ricciardi") as the new technical editor. Shortly thereafter, Lazarus, Ricciardi, and Strauss met in order to divide up their responsibilities. Lazarus decided that Strauss, as associate editor, would coordinate technical reviews, while Ricciardi, as technical editor, would be responsible for dealing with authors, deciding on articles for the Journal, and responding to technical review documents from Microsoft's main office in Redmond.

On October 10, 1989, Strauss contacted Microsoft's Human Resources Department in order to clarify her job responsibilities at the Journal. Strauss complained that, although she was performing many of the technical editor duties, Ricciardi was credited with the technical editor title as well as salary.

On October 17, 1989, Ricciardi resigned from his position as technical editor. According to Microsoft, although Ricciardi was qualified for the job, he was not well-suited for the Journal's highly interactive working environment. According to Strauss, however, Ricciardi had neither the technical knowledge nor the publishing experience necessary to successfully perform as technical editor.

After Ricciardi's resignation in October 1989, Strauss again requested a promotion to the technical editor position, but Lazarus refused. At this time, Strauss told Lazarus that she would not perform the duties of the technical editor as long as Lazarus was unwilling to officially promote her to that position.

On October 18, 1989, Strauss contacted Gwen Weld ("Weld"), Microsoft's Manager of Personnel Practices, in order to file a complaint regarding Lazarus's failure to promote her to the technical editor position. Strauss indicated that the failure to promote was the result of gender discrimination. On November 3, 1989, Weld sent an electronic mail ("e-mail") message to Strauss informing her that she was not promoted because "[her] skills [were] not yet the level of Technical Editor." After Strauss filed her complaint, she began to experience difficulty working at the Journal. Her working relationship with Lazarus and other Journal employees deteriorated and created an unmanageable working environment. Finally, on January 19, 1990, Strauss's employment was terminated.

According to Microsoft, after Ricciardi left the Journal, Lazarus decided not to search for a technical editor, but instead decided to hire Eric J. Maffei ("Maffei") as editor. Microsoft contends that Maffei's technical experience with Microsoft products eliminated the need to search for a technical editor. According to Strauss, however, Lazarus did continue to search for a technical editor to replace Ricciardi, and on November 8, 1989, Maffei began his employment as editor of the Journal, a new position which included the former technical editor responsibilities. In July 1991, the Journal officially hired a technical editor, Gretchen Bilson.

As a result of Microsoft's failure to promote her to the technical editor position, Strauss sues alleging gender discrimination. Specifically, Strauss alleges that: (1) Lazarus's inappropriate behavior in the office, namely, making comments and sending e-mail messages that were offensive to wom-

---

**2.** Microsoft disputes Strauss's claim that she asked Lazarus for a promotion to the technical

editor position prior to October 1989.

en;[3] (2) Strauss's demonstrated ability to perform the technical editor job; (3) a comparison of her qualifications with those of Ricciardi and Maffei; and (4) the differential treatment given to different applicants for the technical editor position, constitute evidence from which a reasonable jury could conclude that Lazarus's failure to promote Strauss to technical editor was based on gender.

Microsoft now moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting it partial summary judgment with respect to that part of the Complaint based on a failure to promote, on the grounds that Strauss has failed to establish a *prima facie* case of gender discrimination. In the alternative, Microsoft argues that, even if Strauss has established a *prima facie* case of gender discrimination, Microsoft has articulated a non-discriminatory reason for not promoting Strauss, namely that she wasn't qualified for the job, and that Strauss has failed to present viable evidence from which a reasonable jury could conclude that Microsoft's non-discriminatory reason is merely pretextual. Strauss opposes the motion. Specifically, Strauss argues that she has established a *prima facie* case of discrimination and that there are genuine issues of material fact as to whether Microsoft's stated reasons for not promoting her are pretextual. Moreover, Strauss argues that the evidence supports a gender discrimination claim based upon a mixed-motives method of proof.[4]

## I. Standard for Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party must initially satisfy a burden of demonstrating the absence of a genuine issue of material fact, which can be done merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The nonmoving party then must meet a burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552.

The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–159, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Hathaway v. Coughlin,* 841 F.2d 48, 50 (2d Cir.1988); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). But the court is to inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for the party," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986), and to grant sum-

---

3. For example, Strauss alleges that Lazarus told her that he was "president of the amateur gynecology club" and that he "referr[ed] to a woman employee as the 'Spandex queen'." Deposition of Karen Strauss ("Strauss Dep."), taken 2/4/92, at 13–15. Also, Strauss states that Lazarus had referred to a black woman as "Sweet Georgia Brown" and offered to pay her 500 dollars to allow him to continue to call her by that name. Strauss Dep., at 24–25. Additionally, Lazarus sent one e-mail message to the entire Journal staff which contained sexual innuendo referring to male genitalia. Lazarus also sent an e-mail message directly to Strauss entitled "Alice in UNIX Land." Finally, Lazarus sent two other

sexually explicit e-mail messages to one Journal employee who subsequently sent the material to the rest of the Journal staff. Strauss Dep., at 26–37.

4. Under a mixed-motives method of proof, a plaintiff can establish employment discrimination if she can demonstrate that an illegitimate factor, such as gender, played a "motivating" or "substantial" role in the employment decision. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989) (opinion of Brennan, Marshall, Blackmun, and Stevens, JJ.).

mary judgment where the nonmoving's evidence is merely colorable, conclusory, speculative or not significantly probative. *Id.* at 249–50, 106 S.Ct. at 2510–11; *Knight v. U.S. Fire Ins. Co.*, 804 F.2d at 12, 15; *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). To determine whether the nonmoving party has met his or her burden, the court must focus on both the materiality and the genuineness of the factual issues raised by the nonmovant. As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510. A dispute over irrelevant or unnecessary facts will not preclude summary judgment, *id.,* but the presence of unresolved factual issues that are material to the outcome of the litigation mandates a denial of the summary judgment motion. *See, e.g., Knight v. U.S. Fire Ins. Co.,* 804 F.2d at 11–12.

Once the nonmoving party has successfully met the burden of establishing the existence of a genuine dispute as to an issue of material fact, summary judgment must be denied unless the moving party comes forward with additional evidence sufficient to satisfy his or her ultimate burden under Rule 56. *See Celotex Corp. v. Catrett,* 477 U.S. at 330 n. 2, 106 S.Ct. at 2556 n. 2 (Brennan, J., dissenting). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1969)); *see also Weg v. Macchiarola,* 654 F.Supp. 1189, 1191–92 (S.D.N.Y.1987).

▪ With respect to employment discrimination cases, district courts should be espe-cially wary of granting summary judgment. *Hillebrand v. M–Tron Indus., Inc.,* 827 F.2d 363, 364 (8th Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). Summary judgment rarely should be granted in "cases alleging employment discrimination because of the special category in which Congress and the Supreme Court visualized these cases." *Id.* Moreover, where one party's "intent and state of mind are implicated," as often occurs in employment discrimination actions, summary judgment is ordinarily inappropriate. *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989) (quoting *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985)).

## II. The *McDonnell Douglas* Standard [5]

The allocation of burdens of production and proof in employment discrimination cases was originally set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). In *McDonnell Douglas,* the Supreme Court held that in order to state a valid employment discrimination claim a plaintiff must first establish a *prima facie* case by showing that (i) she belongs to a protected class; (ii) she applied and was qualified for a job for which the employer was seeking applicants; (iii) she was rejected despite her qualifications; and (iv) after this rejection, the position was filled by someone outside the protected class or the employer continued to seek applications for the position. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *see also Patterson v. Mclean Credit Union,* 491 U.S. 164, 186–87, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989). The burden of establishing a *prima facie* case "is not onerous." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

Once the plaintiff establishes a *prima facie* case, an inference of employment discrimina-

---

**5.** The Court will discuss the standards for proving a discrimination claim under Title VII of federal law. These standards, however, are equally applicable to Strauss's state law employment discrimination claim arising under New York Human Rights Law Section 296 *et seq. See,* *e.g., Song v. Ives Laboratories, Inc.* 957 F.2d 1041, 1046 (2d Cir.1992); *Miller Brewing Co. v. State Div. of Human Rights,* 66 N.Y.2d 937, 938–39, 498 N.Y.S.2d 776, 777–78, 489 N.E.2d 745, 746–47 (1985).

tion arises, *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094 (1981); *see also Patterson,* 491 U.S. at 187, 109 S.Ct. at 2378, and the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected for legitimate, nondiscriminatory reasons. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. In order for the defendant to satisfy its burden, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094–95. If the defendant does not respond to these allegations, judgment must be entered in favor of the plaintiff. *Id.* at 254, 101 S.Ct. at 1094.

If the defendant is able to rebut the presumption of discrimination, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reasons set forth by the defendant were merely pretextual and not the true reasons for plaintiff's promotion denial. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825; *see also Patterson,* 491 U.S. at 187, 109 S.Ct. at 2378; *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

## A. *Prima Facie* Case

■ Microsoft contends that Strauss has failed to establish a *prima facie* case as outlined by *McDonnell Douglas* because she cannot demonstrate either that she was qualified for the position of technical editor, or, that after she was rejected, the Journal continued to seek candidates for the position.[6] The Court disagrees and finds that Strauss has established both that she was qualified to be technical editor and that the Journal attempted to fill the position after Strauss was rejected.

### 1. Strauss's Qualifications

For purposes of establishing a *prima facie* case, the Court finds that Strauss has established that she was qualified at all relevant times for the technical editor position. Candidates for the position of technical editor were required to have both editorial experience and computer programming skills. Microsoft contends that specific qualifications included "editorial experience, understand[ing] the internals of MS–DOS, Windows, and OS/2, and ... either strong programming skills in C, Assembler, or Pascal, or experience in managing advanced applications development...." *See* Affidavit of Lazarus, sworn to July, 1992 ("Lazarus Aff."), at ¶ 23. Microsoft also contends that Strauss did not possess these qualifications. However, neither Ricciardi nor Maffei, who assumed the technical editor responsibilities, met these technical qualifications completely, *see* Resume of Ricciardi, attached as Exhibit "E" to Lazarus Aff.; Resume of Maffei, attached as Exhibit "H" to Lazarus Aff., indicating that it was unnecessary for a "qualified" technical editor to possess all the qualifications cited by Microsoft.

Additionally, although Strauss was still in the process of learning certain of the necessary computer programming skills, *see* Lazarus Aff., at ¶ 28, she received a rating falling between "exceeds performance standards" and "exceptional performance" for her *"technical understanding"* in an August 1989 performance review. *See* Microsoft Performance Review Form, attached as Exhibit "J" to Lazarus Aff. (emphasis added).

Moreover, Strauss successfully performed many of the duties of the technical editor during her tenure at the Journal. *See Gunby v. Pennsylvania Elec. Co.,* 840 F.2d 1108, 1116 (3rd Cir.1988) (plaintiff established qualifications by previously performing duties of the position constituting a "significant facet of the job"); *Nord v. United States Steel Corp.,* 758 F.2d 1462, 1467 (11th Cir. 1985) (plaintiff who performed "many of the duties" of the position for which she was denied promotion established her qualifications by past performance). After Rizzo resigned, Strauss was essentially acting technical editor, assuming many of the responsibilities of the technical editor, including "insuring that the technical reviews were completed," Deposition of Jonathan Lazarus, taken

---

6. Microsoft concedes that Strauss is a member of a protected class and that her application to the technical editor position was rejected.

June 23, 1992 ("Lazarus Dep."), at 87, "talking to the reviewers and the authors about the technical comments that the reviewers had made," Lazarus Dep., at 88, and monitoring "the status of articles" and "proposals from authors." Lazarus Dep., at 178–79. Further, after Ricciardi left the Journal, Lazarus again expected that Strauss would resume performing these same technical editor duties. See Lazarus Aff., at ¶ 24.

Finally, Strauss has produced evidence demonstrating that she was more qualified to perform certain of the tasks of technical editor than Ricciardi. In fact, Ricciardi "did not seem to have much publishing experience and did not seem to know Windows or OS/2," Strauss Dep., at 56–57. Further, his "[lack of] technical or publishing experience" forced Strauss "to help him learn how to do some of these things." Strauss Dep., at 83.

In light of the above evidence, the Court finds that Strauss has established that she was qualified at all relevant times for the technical editor position.

### 2. Microsoft Continued to Seek Candidates for the Position

Microsoft argues that, even assuming Strauss could present sufficient evidence that she was qualified for the position of technical editor, she cannot prove that Microsoft hired someone outside the protected class or that it continued to seek candidates with her qualifications for the position after she was denied the promotion. The Court finds Microsoft's position without merit.

It is undisputed that Strauss formally requested a promotion to the technical editor position on October 18, 1989, following the departure of Ricciardi, and was denied the promotion. Microsoft contends, however, that after this denial it decided not to search for a new technical editor to replace Ricciardi. Rather, it decided to hire a full-time, on-site editor to handle both Rizzo and Lazarus's responsibilities. This contention is belied, however, by Maffei's statement that "in

the second stage of [his] discussion" with Lazarus about employment, Lazarus discussed the possibility of employing Maffei as the "technical editor." See Deposition of Eric J. Maffei, taken May 7, 1992 ("Maffei Dep."), at 47.

■ Moreover, Microsoft's contentions that (1) Maffei got a "different job" than the one for which Strauss applied because he took over all the technical editor responsibilities as well as assumed managerial responsibility for production, art and circulation; and (2) Microsoft did not decide to hire a technical editor until July 1991 when Gretchen Bilson was hired, do not prevent Strauss from establishing a prima facie case. Since Microsoft hired someone in October 1989 to perform the duties of the promotion position that was denied Strauss, it cannot defeat Strauss's prima facie case on the ground that no one with the technical editor title was immediately hired. The focus of the prima facie inquiry must be on whether someone performed the actual, continuing job duties, not on whether the particular position was filled. See Montana v. First Federal Savings and Loan Ass'n, 869 F.2d 100, 105 (2d Cir.1989) (in action for discriminatory termination, plaintiff established prima facie case, even though no one filled her former position, by showing that the majority of her responsibilities were transferred to a younger co-worker); see also Day v. Derwinski, 771 F.Supp. 588, 593 (S.D.N.Y.1991) (abolition of position sought does not defeat plaintiff's claim where the "duties continued to be performed" by a co-worker).

With regard to Strauss's claim that she applied for the technical editor's position on one or more occasions between mid–May and mid–July 1989,[7] it is clear that Microsoft continued to seek candidates for the position of technical editor during this time, and hired Ricciardi, a person outside the protected class, to replace Rizzo in September 1989. Thus, the Court finds that Strauss has satisfied the fourth prong of the McDonnell

---

7. As noted above, Microsoft disputes the fact that Strauss applied for the technical editor position prior to October 18, 1989. However, it recognizes that for purposes of this motion it must accept that Strauss asked Microsoft to promote her to technical editor "in May 1989 and on three other occasions through the summer of 1989." See Reply Memorandum of Defendant in Support of its Motion for Partial Summary Judgment ("Def.Rep.Mem."), at 3.

*Douglas* test and established a *prima facie* case.

## B. Microsoft's Legitimate, Non-discriminatory Reason

██ Under the *McDonnell Douglas* analysis, once the plaintiff establishes a *prima facie* case of employment discrimination, the defendant must articulate a legitimate, non-discriminatory reason for not promoting the plaintiff in order to rebut the presumption of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. In the present case, Microsoft has met this burden by producing evidence that it did not promote Strauss to the technical editor position because she was not qualified, lacking the necessary technical expertise and knowledge. Specifically, Microsoft has produced evidence that Strauss lacked experience in the management of advanced applications development and had yet to acquire strong programming ability in systems such as MS–DOS, Windows, and OS/2.[8] *See* Lazarus Aff., at ¶¶ 34 and 40; Microsoft Performance Review Form, attached as Exhibit "J" to Lazarus Aff.

## C. Strauss's Pretextual Evidence

██ Once the defendant articulates a legitimate, non-discriminatory reason for choosing not to promote an individual, the burden of proof shifts back to the plaintiff to prove by a preponderance of the evidence that the proffered reasons are merely pretextual and not the true reasons for the failure to promote. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825; *see also Patterson,* 491 U.S. at 187, 109 S.Ct. at 2378; *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. The Court finds that Strauss has presented evidence from which a reasonable jury could conclude that Microsoft's stated reason for failure to promote, namely that Strauss was not qualified, is pretextual.

First, Strauss has presented evidence that she successfully functioned as the technical editor after Rizzo resigned from the Journal. Specifically, she was involved in choosing articles, doing technical edits and technical reviews, mediating discussions between authors and reviewers, monitoring the status of articles and proposals from authors, drafting abstracts and editor's notes and answering or obtaining answers to technical questions arising during the production process. *See* Lazarus Dep., at 87, 178–79; Lazarus Aff., at ¶ 28; Strauss Dep., at 21, 84, 308, 309. Moreover, Strauss received a very favorable job performance review for the successful completion of these and other duties. *See* Microsoft Performance Review Form, attached as Exhibit "J" to Lazarus Aff. In fact, she was evaluated by Lazarus as having saved the Journal. *Id.*

Second, there is evidence that Lazarus again asked Strauss to perform the duties of the technical editor after Ricciardi left the Journal in October 1989. *See* Lazarus Dep., at 87, 178–79.

Third, there is evidence that Ricciardi was not as qualified as Strauss for the job. Ricciardi had only limited editorial experience, *see* Resume of Ricciardi, attached as Exhibit "E" to Lazarus Aff.; E–Mail from Lazarus, attached as Exhibit "C" to Affidavit of Julian R. Birnbaum, sworn to on August 14, 1992 ("Birnbaum Aff.") (Lazarus wrote in March 1989 that Ricciardi was "technically qualified, but isn't a great writer/editor—adequate, but not great"), did not have the technical or publishing experience to handle the job, was unable to deal with many technical questions, and asked Strauss to do the technical editing on many articles. *See* Strauss Dep., at 56–57, 83, 86–87, 127. In fact, Lazarus himself told Strauss that he hired Ricciardi although "it didn't make any sense," and Ricciardi "wasn't great." Strauss Dep., at 54–55.

Fourth, Lazarus and Microsoft were willing to hire Maffei despite his lack of editorial experience, a skill required by a technical editor, *see* Lazarus Dep., at 213–14 (Maffei expressed to Lazarus that he "really didn't have any editorial experience"); Maffei Dep., at 93–96; E–Mail regarding Maffei interview,

---

8. Although Microsoft also disputes that Strauss's discussions with Lazarus between April and July 1989 constituted requests for a promotion to the technical editor position, it argues, in the alternative, that if these were promotion requests, Strauss was not promoted at that time because she was not qualified.

1194

attached as Exhibit "M" to Birnbaum Aff. (Maffei will "have one heck of learning curve to come up on since he has not even written for publication, much less acquired materials or managed the editorial process ... IF you decide he is your candidate, then he needs ... a real, real strong right-hand person ... involved in TRAINING him on the issues and problems"), but were unwilling to afford Strauss, who had previously done the job, the same opportunity to learn any necessary skills on the job.

·Finally, when viewed in light of Strauss's other evidence of pretext, Lazarus's inappropriate behavior in the office, namely (1) his comments to Strauss that he was "president of the amateur gynecology club," Strauss Dep., at 13–15; (2) his reference to a woman employee as the "Spandex queen," Strauss Dep., at 13–15; (3) his reference to a black woman as "Sweet Georgia Brown," Strauss Dep., at 24–25; (4) his offer to pay 500 dollars to call the woman "Sweet Georgia Brown," Strauss Dep., at 24–25; (5) his sending one e-mail message to the entire Journal staff about "Mouse Balls," which contained sexual innuendo about male genitalia, Strauss Dep., at 26; (6) his sending an e-mail message directly to Strauss entitled "Alice in UNIX Land," which mixed computer language with sexual innuendo, Strauss Dep., at 34–35; (7) his sending two other sexually explicit e-mail messages to one Journal em-

ployee who subsequently sent the material to the rest of the Journal staff, Strauss Dep., at 28–34, could lead a reasonable jury to conclude that Microsoft's proffered reason is not the true reason for its failure to promote Strauss.[9]

The fact that Strauss did not meet all the job criteria set forth in Microsoft's advertised job description, see Exhibit "D" to Birnbaum Aff., does nothing to diminish the aforementioned evidence of pretext as this advertisement had little relationship to the actual recruiting and hiring process. Lazarus recruited Ricciardi through the recommendation of Rizzo, see Exhibit "C" to Birnbaum Aff., and personally recruited Maffei, who had not seen the advertisement and did not know that there was an opening at the Journal. Maffei Dep., at 59–60. In addition, Lazarus believed that people who are the best programmers do not tend to be the best writers, and that these different skills often conflict, thus making it likely that no one could fit the job description exactly as written. Lazarus Dep., at 39–40.

Thus, the Court concludes that Strauss has presented evidence from which a reasonable jury could determine that Microsoft's proffered reason for not promoting her is pretextual. Accordingly, Microsoft's motion for an order granting it summary judgment is denied.[10]

9. Microsoft contends that Lazarus's remarks and e-mail messages do not constitute admissible evidence, much less sufficient evidence of pretext, because there is no connection between the comments and e-mail messages and the challenged employment decision.

Specifically, Microsoft relies upon *Haskell v. Kaman Corp.*, 743 F.2d 113, 120 (2d Cir.1984) and *Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 (6th Cir.1986), both age discrimination cases, for the proposition that comments similar to those made by Lazarus are not relevant to the question of whether a plaintiff was terminated on account of his age and cannot support a finding of age discrimination. Microsoft's reliance upon these cases is misplaced, however, because unlike the instant case, in those cases, the comments made were abstract and unsupported by other pretextual evidence.

Microsoft also relies upon *Smith v. Firestone Tire and Rubber Co.*, 875 F.2d 1325, 1329 (7th Cir.1989). In that case, the supervisor made remarks that the plaintiff would not be promoted because "one of plaintiff's 'type' was enough." The court conceded that "it would be a reason-

able inference that [the supervisor] was referring to plaintiff's race." *Id.* at 1329. Nevertheless, the court agreed that the demotion was for nondiscriminatory reasons because plaintiff failed to offer any other evidence to demonstrate that the justifications offered by the defendant were pretextual, and the statements were not shown to be related to plaintiff's demotion. *Id.* at 1330.

In the instant case, however, Strauss does not rely solely on Lazarus's remarks and e-mail messages to establish pretext; rather, she has presented significant additional evidence about the abilities of the candidates hired and her own ability to perform the technical editor job. In addition, because the remarks and messages must be viewed in the context of this additional evidence, in contrast to the *Smith* case, Strauss has demonstrated a connection between the remarks and messages and the failure to promote.

10. Because the Court has concluded that Strauss has established a *prima facie* case of discrimination and that there are genuine issues of material fact as to whether Microsoft's stated reasons for not promoting Strauss are pretextual, it need not

## CONCLUSION

For the reasons set forth above, Microsoft's motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting it partial summary judgment, is denied.

SO ORDERED.

address Strauss's contention that the evidence also supports a gender discrimination claim based upon a mixed-motives method of proof.