PROFESSIONAL STAFF
MANAGEMENT, INC.,
Petitioner,

v.

DEPARTMENT OF EMPLOYMENT
SECURITY, Respondent.

No. 960583–CA.

Court of Appeals of Utah.

Feb. 12, 1998.

Richard S. Nemelka, Salt Lake City, for Petitioner.

Emma R. Thomas and Lorin R. Blauer, Salt Lake City, for Respondent.

Before BENCH, JACKSON and ORME, JJ.

## OPINION

ORME, Judge:

Petitioner Professional Staff Management, Inc. (PSM), an employee leasing company, challenges five separate decisions of the Industrial Commission's Board of Review ruling that unemployment benefits paid to five former PSM employees would be charged against PSM's benefit account because the employees did not voluntarily terminate their employment with PSM. We reverse.

1. Previously, this section appeared as § 35–4–5 and then as § 35–4–405. A 1996 amendment,

## THE "CHARGE–BACK" SYSTEM

This case involves the "charge-back" feature of Utah's unemployment compensation program. As explained by counsel for the Board of Review during oral argument, the concept underlying this system is to share the cost of a worker's unemployment benefits among those employers who caused the worker's ultimate unemployment. Thus, if one employer terminates a worker who is then hired by another employer, only to be terminated by that employer, both employers should contribute to the cost of the worker's unemployment benefits. The underlying rationale is that if the prior employer had kept the worker employed, he or she would not have been hired by the employer who terminated him or her and would not now be unemployed.

In order to make the allocation when an employee has had more than one employer, reference is made to the "base-period," which "means the first four of the last five completed calendar quarters next preceding the first day of the individual's benefit year." Utah Code Ann. § 35A–4–201(1) (1997). "Benefit costs of former workers of an employer will be charged to the employer in the same proportion as the wages paid by that employer in the base period bear to the total wages of all employers of that worker in the base period...." Id. § 35A–4–306(1).

However, benefit costs of a former worker will not be charged to a prior base-period employer if the claimant received benefits following a quit that was not attributable to that employer. See id. § 35A–4–307(1). In other words, an employer will be relieved from unemployment benefit charges if the claimant *voluntarily* left employment with that employer "due to circumstances that would have resulted in a denial of benefits" under Utah Code Ann. § 35A–4–405(1) (1997). See Utah Code Admin. P. R562–303–109(1)(a)(i)(A) (1996). Under that statutory provision, a claimant is ineligible for benefits if "the claimant left work voluntarily without good cause." Utah Code Ann. § 35A–4–405(1) (1997).[1]

effective July 1, 1997, renumbered this section as

"Voluntarily leaving work means that the employee severed the employment relationship as contrasted to a separation initiated by the employer." Utah Code Admin. P. R562–5a–1 (1996). *See Lanier v. Industrial Comm'n,* 694 P.2d 625, 628 (Utah 1985); *Department of the Air Force v. Department of Employment Sec.,* 786 P.2d 1361, 1365 (Utah Ct.App.), *cert. denied,* 795 P.2d 1138 (Utah 1990); *Allen v. Department of Employment Sec.,* 781 P.2d 888, 890 (Utah Ct.App.1989). In previously construing the provision that is now subsection 35A–4–405(1)', the Utah Supreme Court defined "voluntarily" to mean "at the volition of the employee, in contrast to a firing or other termination at the behest of the employer." *Chandler v. Department of Employment Sec.,* 678 P.2d 315, 320 (Utah 1984).

## FACTS OF THESE CASES

On May 11, 1993, MEI Excavation entered into a contract with PSM, a licensed employee leasing company,[2] in which MEI became the "client company" and MEI's employees became employees of PSM. On December 9, 1994, MEI and PSM renewed their contract. It was agreed that Blaine Moulton, president of MEI, would act as PSM's designated on-the-job supervisor. Gerald C. Frisbee, Ivan R. Fackrell, David L. Reid, James R. Thorpe, and Doran L. Cartmell (the claimants) were employees of PSM as of the contract's renewal date and, thus, remained employees of PSM. The contract between PSM and MEI provided that MEI did not have the authority to terminate any PSM employee.

Shortly after the contract was executed, Moulton met with the claimants and other MEI employees and explained the employee leasing situation to them, giving each employee a copy of PSM's Personnel Policies and Safety Procedures Manual. Each of the claimants, with the exception of Frisbee, signed an Employee Acknowledgment of Manual form, which stated that the employee had read and would abide by the policies and rules of the manual.[3]

On February 17, 1995, without cause and before the contract term's expiration, MEI terminated its contract with PSM and contracted with another employee leasing company, Wasatch Services. MEI gave PSM only a few days notice of termination rather than the thirty days notice as required under its contract with PSM. Moreover, MEI did not allow PSM to speak to its employees following MEI's termination of the contract.

Because PSM was not allowed to speak to its employees, the claimants and other employees were given no information about MEI's breach of contract and the effect this would have on their relationship to PSM. They were told only that MEI was "changing ... payroll companies." However, at PSM's request, form letters[4] were drafted by PSM

---

§ 35A–4–405. The substance of the provision was not affected by these recodifications.

**2.** The employee leasing company is a relatively new form of business. Pursuant to a written contract, the employee leasing company assumes the responsibility for a client company's workers. The employee leasing company then leases those workers back to the client company to do the client company's work. For purposes of the Utah Employment Security Act, the employer is the employee leasing company. *See* Utah Code Ann. § 35A–4–202(1)(a)(ii), –203 (1997); Utah Code Admin. P. R562–202–103 (1996). This not only spares the client company the headaches of personnel and payroll management, but also permits employee benefits, such as medical insurance, to be secured more economically, as the leasing company may have hundreds of employees while the client company might have only a handful. To operate in Utah as an employee leasing company, a company must be licensed and comply with the requirements set forth in

Utah Code Ann. §§ 58–59–302 to –306 (Supp. 1997).

**3.** The employees who testified do not actually recall receiving the policy and procedures manual.

**4.** The letters read as follows:

I, the undersigned hereby understand the relationship between my employer Professional Staff Management and M.E.I., a client of Professional Staff Management is not going to continue at this time.

At this time I wish to quit my employment with my employer Professional Staff Management and have chosen to accept employment with M.E.I.

In addition I understand that this is of my own free will and that if I so choose, I could have continued my employment with Professional Staff Management.

Please allow this to be placed in my permanent employment file and accept my resignation.

and presented to its employees for their signature at a meeting in February 1995. At this meeting, the employees were told by Moulton that their signatures were needed on the letter to complete the change to the new "payroll" company. Each employee, including the claimants, signed the form letter.

The claimants continued their employment with Wasatch Services, while working for MEI, until about February 1996, when the claimants were laid off at the behest of MEI. The claimants subsequently filed individually for unemployment benefits with the Utah Department of Employment Security. The subtleties of employee leasing were largely lost on the claimants, as all listed MEI as their last employer, although two forms contained the parenthetical notation "Wasatch."

After the claimants were determined eligible for unemployment benefits, the Department of Employment Security decided that an appropriate portion of the unemployment benefits paid to each claimant would be charged to PSM's benefit account. PSM appealed the Department's decisions, arguing that the claimants voluntarily ended their employment with PSM and, therefore, PSM should be relieved of any charges to its benefit account. In four cases, the administrative law judge ruled in PSM's favor. In the fifth case, the administrative law judge sided with the Department. The appeals eventually found their way to the Board of Review. Despite the letters and acknowledgment-of-manual forms the claimants signed, the Board determined that there was no evidence in the record showing that the claimants understood their employment relationship with PSM. The Board ultimately held that PSM's benefit account should be charged for the unemployment benefits paid to the claim-

ants because PSM was the moving party in the separations and, therefore, the claimants did not voluntarily leave work. *See* Utah Code Ann. § 35A–4–306(1), –307(1) (1997); Utah Code Admin. P. R562–303–109(1)(a)(i)(A) (1996). The Board reached this determination only by characterizing Moulton, MEI's president but PSM's on-site supervisor, as PSM's agent and attributing his conduct to PSM.[5] PSM sought judicial review of these decisions, and we ordered consolidation of the cases.

## STANDARD OF REVIEW

 Our review of these cases calls for the application of statutes and administrative rules to a specific factual situation. When we review an agency's application of the law to a particular set of facts, we give a degree of deference to the agency. *See Drake v. Industrial Comm'n*, 939 P.2d 177, 181 (Utah 1997). An "agency's application of the law to the facts may, depending on the issue, be reviewed … 'with varying degrees of strictness, falling anywhere between a review for "correctness" and a broad "abuse of discretion" standard,'" *id.* (citations omitted), and should "tak[e] into account factors such as policy concerns and an agency's expertise." *Id.* at 181 n. 6. *See State v. Pena*, 869 P.2d 932, 936–39 (Utah 1994). In this case, proper application of the Employment Security Act and the relevant rules "requires little highly specialized or technical knowledge that would be uniquely within the Department's expertise." *Allen v. Department of Employment Sec.*, 781 P.2d 888, 890 n. 4 (Utah Ct.App.1989). Thus, this court will review the agency's decision "with only moderate deference" in determining whether it

---

I also understand that I am eligible for rehire with Professional Staff Management.

5. The Board's rationale is perplexing. Moulton did not terminate the claimants' employment in any traditional sense. Clearly acting for MEI and not as an agent for PSM, he ended MEI's leasing contract with PSM. He prevailed upon the claimants, who continued working for MEI as before, to become employees of Wasatch. None of this served the interests or purposes of PSM.

The termination of the claimants' formal employment relationship with PSM has none of the

hallmarks of traditional unemployment; it was merely a by-product of MEI's switching leasing companies. On one day the claimants were working for MEI and on the next day they were working for MEI. That they must be regarded as employees of PSM on the first day and of Wasatch the next is essentially a fiction imposed statutorily. *See supra* note 2. The dilemma confronted by the Board is the same one we face: Having to decide whether PSM or the claimants must be legally regarded as responsible for the termination of their relationship even though in reality the instigator was MEI.

falls within the limits of reasonableness and rationality. *Id.*

■ The narrow question of "[w]hether the termination of employment ... was the result primarily of the employee's volition is [one] of fact." *Id.* at 890. *See Lanier v. Industrial Comm'n,* 694 P.2d 625, 628 (Utah 1985). We will not disturb an agency's factual findings so long as they are supported by substantial evidence on the record as a whole. *See Drake,* 939 P.2d at 181.

## ANALYSIS

■ At the outset, we note that the Utah Employment Security Act forces us to decide which of two relatively blameless parties— namely, the claimants or PSM—is most responsible for the termination of the formal employment relationship between them. *See supra* note 5. In actuality, it is difficult to say that the claimants voluntarily quit their employment with PSM or that they were fired by PSM. Indeed, the claimants had no real sense of a change in their employment status when MEI, the company for which they actually worked, switched "payroll" companies. Although PSM's designated on-site supervisor, Blaine Moulton, handed out the letters of resignation to the claimants and other employees, he acted after MEI had unilaterally terminated its contract with PSM. Thus, as a matter of law, Moulton had ceased to be an agent of PSM and was therefore acting only as MEI's president. *See Wells v. Walker Bank & Trust Co., Inc.,* 590 P.2d 1261, 1264 (Utah 1979) (holding that principal is not bound by acts of agent intending to further agent's own self-interest rather than interests of principal). Consequently, MEI, acting through Moulton, can most easily be identified as the party responsible for the claimants' separation from PSM. However, given the legal framework imposed by the Employment Security Act, we are forced to determine, somewhat abstractly, whether PSM or the claimants were the responsible party, without consideration of MEI's pivotal involvement.

■ The Board concluded that PSM, through Moulton as its agent, was the party most responsible, and that the claimants did not voluntarily quit their employment with PSM. We conclude that the Board's findings lack *any* evidentiary support in the record. In contrast, the sparse evidence in the record will support the finding that the claimants voluntarily terminated their employment with PSM to accept alternative employment. From all that appears, PSM was happy to continue its employment relationship with the claimants and did not initiate the separation. After its contract was terminated by MEI, PSM wanted to talk with the claimants and the other employees, but was denied the opportunity by MEI. Only after MEI denied PSM this opportunity did PSM draft resignation letters, which clearly stated that the claimants could continue employment with PSM if they so desired.

The claimants, of their own volition vis-a-vis PSM, assented to the cessation of their employment by executing these letters of resignation and then accepting employment with Wasatch Services. *See Chandler v. Department of Employment Sec.,* 678 P.2d 315, 320 (Utah 1984); Utah Code Admin. P. R562–5a–1 (1996). Although the claimants may not have fully understood their legal relationship with PSM before receiving the resignation letter, the letter clearly apprised them of their employment relationship with PSM and their option of continued employment by PSM. *See supra* note 4. The letter and the manual show that the claimants could have stayed with PSM if they chose and PSM would have been responsible to find them similar work. Nonetheless, each claimant opted, in the words of their letters, "to quit my employment with my employer Professional Staff Management."

To be sure, claimants did precious little to affect their relationship with PSM. But at least they signed letters recognizing their opportunity to continue their employment by PSM and opting instead to quit. By contrast, PSM took no active part in altering the claimants' employment status, sitting helplessly by while MEI terminated its contract without cause, thereby depriving PSM of the continued opportunity to furnish workers to MEI. Thus, while there is evidence in the record which would support a finding that claimants voluntarily ended their employ-

ment with PSM, there is no evidence supporting the Board's contrary finding. Given its erroneous factual findings and its legal error in characterizing Moulton as PSM's agent after he caused MEI to breach its contract with PSM, it follows that the Board's decision exceeds the bounds of reasonableness and rationality and must be reversed. PSM is entitled to be relieved of benefit charges in connection with these claims, pursuant to Utah Code Ann. § 35A–4–307 (1997).

## CONCLUSION

The evidence does not support the Board of Review's findings that the claimants did not voluntarily quit their employment with PSM. Its characterization of Moulton as PSM's agent is legally flawed. Thus, the Board of Review's decision must be reversed, and PSM is relieved of any costs for unemployment benefits paid to the claimants.

BENCH and JACKSON, JJ., concur.