CATERPILLAR, INC., Plaintiff-Appellant, v. THE DEPARTMENT OF EMPLOYMENT SECURITY *et al.*, Defendants-Appellees.

Second District    No. 2—99—0810

Opinion filed May 15, 2000.

Michael A. Warner and Cynthia C. Mooney, both of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, and Gabrielle D. Greer, of Caterpillar, Inc., of Peoria, for appellant.

James E. Ryan, Attorney General, of Chicago (Jerald S. Post, Assistant Attorney General, of counsel), for appellees Board of Review of the Department of Employment Security, Lynn Doherty, and Department of Employment Security.

M. Katherine Moran, of Schanlaber & Reed, of Aurora, for appellee Terry Logan.

JUSTICE McLAREN delivered the opinion of the court:

Plaintiff, Caterpillar Incorporated (Caterpillar), appeals from a judgment of the circuit court affirming the decision of the Illinois Department of Employment Security Board of Review (Board), which granted claimant Terry Logan's claim for unemployment benefits. On appeal, Caterpillar contends that Logan was ineligible for unemployment benefits because he was discharged for misconduct connected with his work. We reverse.

Logan began working for Caterpillar in 1973 and was fired on or about August 12, 1997. After a claims adjudicator found that the claimant was eligible for unemployment benefits, Caterpillar appealed. A hearing on this appeal ensued before a referee of the Department of Employment Security. The following evidence was presented before the hearing referee.

Wendy Watta, formerly Vosberg, a Caterpillar power train design engineer, testified that during 1996 and early 1997 she and Logan had a romantic relationship. She stated that, after 1½ years, she broke up with Logan at the end of March 1997. They remained friends, and, in fact, Watta last slept with Logan as late as May 31, 1997.

Watta testified that, on June 1, 1997, she asked Logan for the keys to her house and her garage door opener and told Logan "point blank" not to call her or stop by. Logan did not return the requested items, so Watta had the locks of her house changed and tried to change the security device on her garage door.

Watta stated that throughout June and July 1997 Logan harassed Watta, both at home and at work, attempting to convince Watta to come back to him. At work, Logan repeatedly called her, stopped by her desk, and e-mailed her. Watta stated that, at home, Logan repeatedly stopped by, waited in his car for her to return home, and left cards in her mailbox. When Watta would tell Logan that she did not want to discuss their relationship, Logan would begin talking about work. Logan also called Watta at work twice pretending to be someone else. Logan did not identity himself, but Watta recognized his voice. Subsequently, Watta returned home and found Logan sitting in his car in her driveway. Logan told Watta that he had been waiting for her for four hours and was upset because he wanted to put a welcome banner up in her garage but that she had locked the garage. Watta's neighbor, a police officer, spoke with Logan about the incident.

Watta testified that she also received in the mail a copy of a card and letter she had sent to Eric Rueschhoff, Watta's new boyfriend, who lived in Peoria. Watta also received an address book that had been in Rueschhoff's home. Rueschhoff had previously reported to the police that his home had been burglarized and listed these items as missing. Watta concluded that Logan had broken into Rueschhoff's home and sent the items to her. Watta became concerned that Logan had broken into her home as well.

Watta testified that Logan also tried to break into a long distance call Watta was on because he could not get through to her. He continued to call and leave messages. Watta explained that she returned his calls because she had to work with him at Caterpillar.

Watta stated that on July 10, 1997, she left a letter on Logan's desk stating that she did not want to get back together with him and that he should stop calling Watta, her friends, and her family and quit stopping by her desk and home. On that same day, she spoke with Bill Abrogast, Caterpillar personnel services manager, and told him about Logan's conduct.

Watta stated that Logan's conduct caused her to become so

frightened for her safety that she moved out of her house for three weeks and had an alarm system installed in her home. Further, Logan's conduct made it difficult for Watta to work because she was always looking over her shoulder and it was difficult to answer the phone for fear that it would be Logan harassing her. Throughout the months of June and July, Logan had repeatedly threatened to ruin Watta's reputation.

However, Watta admitted that after June 1, 1997, she spoke with Logan and sent him e-mails to try to get her belongings back. Also, she admitted that on June 25, 1997, she and Logan had dinner together and stopped by a park to talk about how to keep on friendly but not romantic terms at work. She explained that she had dinner with him even though he was harassing her at work because she had to continue working with him.

Watta testified that on July 21, 1997, she told the police that she would be going out of town the following day and that she was concerned about Logan's conduct. The next day at 4 a.m., the police found Logan in Watta's garage. They had been watching Watta's home because the burglar alarm had gone off earlier that morning, triggered by a cat.

Watta stated that on July 25, 1997, she gave a detailed statement to Rita Knapp, a Caterpillar security investigator, regarding Logan's conduct. On July 29, 1997, Watta gave the police a statement regarding Logan's conduct. On or about August 1, 1997, Watta contacted the State's Attorney's office and sought and received an interim order of protection against Logan on August 11, 1997. The order prohibited Logan from any contact with Watta including phone, e-mail, and ground mail. However, according to Watta, Logan contacted her even after the order of protection was issued. On September 3, 1997, a two-year order of protection was issued against Logan.

Logan testified that it was common for other Caterpillar employees to use the company e-mail and telephones for personal purposes but that to his knowledge no one had ever been disciplined for it before. Logan was never warned or disciplined for using Caterpillar's e-mail or phones for personal use. Further, 95% of his personal e-mails and conversations with Watta regarding their relationship occurred outside of work.

Logan believed his relationship with Watta continued throughout June and July and that they were simply trying to "resolve issues." They exchanged e-mails and spoke on the phone. In e-mails Watta sent to Logan in June, Watta wrote that she loved Logan. Logan and Watta slept together twice in June 1997. Logan stated that he and Watta had discussed marriage as late as June 1997; they had been

practically living together. Logan had moved some of his belongings and his dog over to Watta's house during the 1997 Memorial Day weekend.

Watta never told Logan to stay away from her. Logan did not know that his relationship with Watta was breaking up until July 25, 1997. Logan knew that Watta spoke with Abrogast about their relationship on July 10, 1997, but Logan believed Watta did it spontaneously and out of anger. On July 2, Watta responded in an e-mail to Logan's request for a dinner date. She stated that she was too busy but perhaps could make it the next week. Also, on July 22, 1997, Watta and Logan discussed going to see a counselor for their relationship. This showed Logan that Watta was willing to get together with him. Logan did not receive the letter Watta said she left on his desk on July 10, 1997, telling Logan to stop calling her.

Logan stated that, at 4 a.m., July 22, 1997, he drove to Watta's home to ensure that she would be up in time to catch a flight. Watta needed to be at Caterpillar at 4:30 a.m. Logan did not see any lights on at Watta's house so he became concerned. Watta told Logan the day before that she was not sure whether she would make it. When Logan activated the garage-door opener, the Yorkville police pulled in behind Logan. Logan was not arrested or detained by the police.

Logan testified that on August 5, 1997, he met with Dave Wendling, Caterpillar's safety security manager; Rita Knapp, a Caterpillar security investigator; and Joe Porter, Logan's supervisor at Caterpillar, to discuss his relationship with Watta. The meeting lasted three hours. Two hours into the meeting, Logan told the security officers that he needed to be at another meeting and needed to take his medication for attention deficit disorder (ADD). The officers said they would take care of Logan's other meeting and did not permit Logan to take his medication or to take a break. Logan could hardly remember anything after this point. During the meeting, Logan broke down and cried. Prior to this meeting, no one at Caterpillar ever discussed his relationship with Watta or told Logan to stay away from her.

Logan stated that he had been an active member of the diversity council at Caterpillar and had participated in a number of meetings and seminars addressing race and gender issues. Logan had a reputation for respecting women at Caterpillar and was asked to be part of a special team that addressed gender issues. Before Watta's complaint, there had never been a complaint against Logan regarding his relationship with women at Caterpillar.

Logan acknowledged that he spoke with Abrogast on July 10 and July 28, 1997. Logan stated that on July 10, 1997, Watta told him that she had told Abrogast that she was having problems with a coworker.

Logan told Abrogast that he and Watta had a romantic relationship that had become rocky near the end. Abrogast told Logan to keep business, business, and personal, personal. Abrogast told Logan that Abrogast could not become involved in a personal matter, but he did not tell Logan to stay away from Watta.

Logan also denied that he broke into Watta's new boyfriend's home on June 21, 1997. Although he was charged with criminal trespass and residential burglary, he was found not guilty of these offenses. Logan also denied breaking into Watta's house. The charge of criminal trespass was nol-prossed.

Logan explained that he voluntarily agreed to the entry of the orders of protection and that there was no judicial determination that an order of protection be entered. However, the September 3, 1997, plenary order of protection admitted into evidence did not indicate that Logan agreed to its entry. The order stated that "It is necessary to grant relief in order to protect [Watta] or other abused persons."

Dave Wendling, Caterpillar's safety security manager, testified that he was notified by his staff that the Yorkville police detained Logan because he was found in Watta's garage on July 22, 1997.

Wendling stated that, during the August 5, 1997, meeting, Logan admitted that Abrogast told Logan to stay away from Watta on July 28 and possibly on July 10, 1997, as well. Logan also admitted that he contacted Watta after Abrogast told him not to do so, made approximately 30 harassing phone calls to Rueschhoff in July, broke into Rueschhoff's home and took property, and made up a story to discredit Rueschhoff to Watta. Wendling acknowledged that, at this August 5 meeting, Logan was emotionally distressed, could not recall his actions, rambled at times, cried, and had difficulty putting his thoughts together.

Wendling testified that he; Mark Thompson, the analysis control manager; Joe Porter, Logan's supervisor; and Abrogast decided to terminate Logan for his conduct. On August 13, 1997, Wendling, Thompson, and Porter told Logan he was being terminated because he abused company resources, failed to comply with Abrogast's orders, and harassed two Caterpillar employees, Watta and Rueschhoff.

Wendling admitted that he referred to his own and Rita Knapp's notes during his testimony but stated that he testified according to his own recollection of events. Knapp did not testify at the hearing and, although her notes were admitted into evidence, the hearing referee stated that the notes constituted hearsay.

Bill Abrogast, personnel services manager for Caterpillar, testified that on July 9, 1997, he received an e-mail from Watta stating:

"There is an employee here at the plant that will not stop bother-

ing me about going out with him and continues to contact me even after I have asked him not to. I need to have someone in personnel aware of this problem, because if he continues to contact me I will not tolerate it and ask that you communicate this to him. He has acted unstable enough that I am now afraid for my safety or what he will do next."

Abrogast stated that, the next day, July 10, 1997, he met with Watta, and she told Abrogast that she had broken off her romantic relationship with Logan, but that Logan would not leave her alone either at work or at home. Watta also told Abrogast that she had given Logan a letter earlier that day telling Logan to leave her alone. At this time, Abrogast did not believe that Logan's conduct constituted sexual harassment, but he believed an investigation was warranted. However, these thoughts were not contained in Logan's notes of the meeting. Later that day, Abrogast met with Logan. Abrogast told Logan that Abrogast knew that Watta had given him a letter asking Logan to leave her alone. Abrogast also told Logan that Watta had complained about Logan's conduct and that she wanted Logan to stay away from her. Logan told Abrogast that Logan and Watta had a romantic relationship but that Watta "had basically dropped him," and Logan was having a hard time. Abrogast then told Logan to leave Watta alone. Abrogast's notes of the meeting, prepared the next day, were admitted into evidence at the hearing. These notes indicated that Logan told Abrogast that Watta had written Logan a letter asking Logan to stay away from her at work and at home. The notes also indicate that Abrogast told Logan to heed Watta's letter and that even "an unwanted approach away from work could have implications." Abrogast also testified that he met with Logan again on July 28, 1997, and told Logan to stay away from Watta.

Abrogast testified that Logan participated in Caterpillar's diversity council, which met to discuss, among other things, gender issues in the workplace, including sexual harassment, and Caterpillar's sexual harassment policy. As a council member, Logan attended a six-day seminar regarding various workplace issues including sexual harassment. Logan was a manager at Caterpillar and educated other employees regarding Caterpillar's sexual harassment policy. As a member of the diversity council, Logan knew that conduct outside the workplace and repeatedly asking a coworker for a date could constitute sexual harassment. Logan also knew that he could be terminated for such conduct.

Abrogast stated that Caterpillar's written sexual harassment policy was disseminated to all Caterpillar employees. Caterpillar's written sexual harassment policy provided in pertinent part:

"Sexual harassment is any unwelcome sexual advances, requests for sexual favors, or any conduct of a sexual nature when:

\* \* \*

such conduct substantially interferes with an individual's work performance or creates an intimidating, hostile or offensive work environment. Sexual harassment can include:

any unwelcome action that creates an abrasive or hostile work environment. \*\*\*

\*\*\*

subtle pressure for sexual activity.

All supervisors are required to take prompt action to eliminate any and all forms of sexual harassment. A fair and impartial review will be made of any allegations of sexual harassment. At the conclusion of such review, appropriate action will be taken which may include disciplinary measures up to and including such discharge."

Logan was terminated on August 13, 1997. At that time, he had been working at Caterpillar for 24 years. The reasons given were harassment of two Caterpillar employees, failure to follow an order from Abrogast, and misuse of Caterpillar resources. Logan filed for unemployment compensation. Caterpillar challenged the claim, arguing that Logan had been discharged due to misconduct connected to his employment. The Office of Employment Security initially determined that Logan had not been discharged because of misconduct connected with his work. Caterpillar appealed this determination. After a hearing, a hearing referee ruled that Logan was discharged for violating Caterpillar's sexual harassment policy and was discharged for misconduct connected to his work. Thus, Logan was subject to disqualification for benefits under section 602(A) of the Unemployment Insurance Act (Act) (820 ILCS 405/602(A) (West 1996)).

The referee reversed the claim adjudicator's decision, finding that Logan was not eligible for unemployment benefits because he was discharged as a result of misconduct connected to work. Logan then appealed to the Board, which reversed the referee's decision finding, *inter alia*, that Caterpillar told Logan to stop seeing Watta, Logan was terminated because he would not stop seeing Watta, and most of Logan's conduct with Watta took place outside of work. The Board concluded, *inter alia*, that Caterpillar's contention that Logan was discharged for sending personal e-mails to Watta was meritless, there was insufficient evidence to show that Logan harassed Rueschhoff, and Logan's disregard of Caterpillar's order was not willful. Caterpillar then appealed to the circuit court. The circuit court affirmed the Board's decision, and Caterpillar again appeals.

On appeal, Caterpillar argues that the Board and the trial court erred by finding that Logan was not discharged because of misconduct

connected to work. Logan argues that the Board's decision was not against the manifest weight of the evidence.

■ Under section 602 of the Unemployment Insurance Act (820 ILCS 405/602(A) (West 1996)), a former employee is ineligible for unemployment benefits if he has been discharged for misconduct connected to his work. Misconduct is defined as:

> "[(1)] [T]he deliberate and willful violation of [(2)] a reasonable rule or policy of the employing unit, governing the individual's behavior in performance of his work, [(3)] provided such violation has harmed the employing unit or other employees or has been repeated by the individual despite a warning or other explicit instruction from the employing unit." 820 ILCS 405/602(A) (West 1996).

See also *Perto v. Board of Review*, 274 Ill. App. 3d 485, 491 (1995). To establish misconduct all three requirements must be fulfilled. *Garner v. Department of Employment Security*, 269 Ill. App. 3d 370, 374 (1995).

■ It is well established that in a case involving a claim for unemployment benefits the burden of establishing eligibility for benefits is on the claimant. *Greenlaw v. Department of Employment Security*, 299 Ill. App. 3d 446, 448 (1998). However, on review, the Board's findings of fact are considered *prima facie* true and correct, and a reviewing court's function is to determine whether the Board's findings are against the manifest weight of the evidence. *Greenlaw*, 299 Ill. App. 3d at 448. A decision is against the manifest weight of the evidence if the opposite conclusion is clearly evident. *Perto*, 274 Ill. App. 3d at 490. However, "[w]hether an employee's conduct amounts to statutory misconduct is a question of law and [is,] therefore[,] subject to *de novo* review." *Grigoleit Co. v. Department of Employment Security*, 282 Ill. App. 3d 64, 71 (1996). Thus, a reviewing court may reverse the Board's decision if it was based on an erroneous interpretation or application of the law. *Katten Muchin & Zavis v. Department of Employment Security*, 279 Ill. App. 3d 794, 799 (1996).

■ In this case, the Board's findings of fact regarding the nature of Logan's conduct are not against the manifest weight of the evidence. But its conclusion of law regarding these facts is erroneous. It is well settled that an employee's act of misconduct is willful if he is aware of a company rule and then disregards that rule. *Lachenmyer v. Didrickson*, 263 Ill. App. 3d 382, 389 (1994). The Board found that Caterpillar told Logan to stop seeing Watta, and Logan did not stop seeing Watta. The record clearly supports these findings. Yet, the Board then concluded that Logan's behavior did not constitute misconduct because it was not willful. This reasoning is plainly unsound. The implication of the Board's reasoning is that Logan could not control himself.

However, there was nothing in the record to support this conclusion. The record does not indicate that Logan was insane or acted involuntarily when he disobeyed direct orders to stay away from Watta. Logan's infatuation with Watta may be the reason he disobeyed these orders, but it did not excuse his conduct or change his conduct into anything less culpable than willful and wanton behavior. Accordingly, the Board's conclusion that Logan did not act willfully is erroneous as a matter of law.

We also agree with Caterpillar that its order to Logan that he stay away from Watta was reasonable. Standards of behavior that an employer has a right to expect constitute reasonable rules and policies. See *Bandemer v. Department of Employment Security*, 204 Ill. App. 3d 192, 195 (1990). Further, a rule or policy does not have to be written or otherwise formalized. See *Bandemer*, 204 Ill. App. 3d at 195. "[T]he employer is not required to prove the existence of a reasonable rule or policy by direct evidence, but the court may reach that determination by a commonsense realization that certain conduct intentionally and substantially disregards an employer's interests." *Greenlaw*, 299 Ill. App. 3d at 448. In this case, the Board made no express findings regarding this issue. However, common sense implies the existence of a policy against employees continually making unwanted contact with a coworker at work and outside of work regarding their romantic relationship, especially when the unwanted contact interferes with the coworker's ability to perform at work. An employer has the right to expect that an employee will comply when an employer expressly orders an employee to stop making unwanted contact with a coworker.

Next, Caterpillar argues that Logan violated a reasonable rule or policy by disobeying an order and violating Caterpillar's sexual harassment policy. Logan essentially argues that he did not violate a reasonable rule or policy because he was not ordered to stay away from Watta.

Logan ignores the fact that the Board expressly found that Caterpillar ordered Logan to stay away from Watta and he did not obey this order. Contrary to Logan's assertion on appeal, the record contains ample evidence to support this finding. Abrogast testified that he told Logan on two separate occasions to stay away from Watta. Further, Wendling testified that Logan admitted that Abrogast told him to stay away from Watta at least once and possibly twice. It was also uncontroverted that Logan did not obey these orders and failed to stay away from Watta. Thus, the Board's findings that Logan was discharged for failing to obey orders is not against the manifest weight of the evidence. However, its legal conclusion that Logan's conduct did not constitute misconduct within the meaning of the Act was erroneous.

Logan asserts that he did not violate Caterpillar's sexual harassment policy and that he did not violate a federal sexual harassment law. We need not address this issue, because the record supports the Board's finding that Caterpillar communicated an order to Logan and Logan disobeyed the order, which was not contingent solely on Caterpillar's sexual harassment policy.

Logan also asserts that Caterpillar failed to follow its own sexual harassment policy by failing to investigate allegations of Logan's misconduct. However, Logan fails to recognize that a denial of unemployment benefits is not contingent on an employer following its own disciplinary procedures. *DeBois v. Department of Employment Security*, 274 Ill. App. 3d 660, 664 (1995).

Finally, Caterpillar argues that Logan's conduct harmed Watta and Caterpillar. Logan argues that Caterpillar failed to show that Logan's conduct caused harm to either Caterpillar or Watta. We agree with Caterpillar.

We note that benefits may be denied in the absence of a showing of actual harm where the employee disobeyed an explicit instruction from his employer. See 820 ILCS 405/602(A) (West 1996). See also *Perto*, 274 Ill. App. 3d at 491. In this case, unlike the cases cited by Logan and the Board (*Garner*, 269 Ill. App. 3d at 377; *Zuaznabar v. Board of Review of Department of Employment Security*, 257 Ill. App. 3d 354, 358 (1993)), the record indicates and the Board found that Logan disobeyed a direct order to stay away from Watta. Thus, benefits could properly be denied even if Logan's conduct did not cause actual harm. However, the record in this case established actual harm. In this case, Watta testified that Logan's conduct hindered her ability to perform her job. It was uncontroverted that Watta's fear of Logan caused her to move out of her house, change her locks, install a burglar alarm, file criminal trespass charges against Logan, and seek and obtain a restraining order against Logan. Watta's fear of Logan so affected her that it was difficult for her to work. In fact, it was uncontroverted that Watta was afraid to answer her phone at work, was always looking over her shoulder at work, and feared for her reputation at work, all causing her to seek assistance from Abrogast. It is well established that depriving a company of an employee's services causes harm to the employer within the meaning of the Act. See *Lachenmyer*, 263 Ill. App. 3d at 389. The Board's finding to the contrary is against the manifest weight of the evidence. Accordingly, we determine that the Board's finding that Logan was not discharged for misconduct within the meaning of the Act is erroneous. Therefore, the trial court erred by affirming the Board's decision.

The judgment of the circuit court of Kendall County is reversed.

Reversed.

INGLIS and HUTCHINSON, JJ., concur.