2001 UT App 198

**AUTOLIV ASP, INC., Petitioner,**

v.

**DEPARTMENT OF WORKFORCE SERVICES, Workforce Appeals Board; Thomas A. King; and Christopher Guzman, Respondents.**

No. 20000574–CA.

Court of Appeals of Utah.

June 28, 2001.

Janet Hugie Smith and Paul C. Burke, Ray Quinney & Nebeker, Salt Lake City, for Petitioner.

Lorin R. Blauer, Salt Lake City, for Respondent Department of Workforce Services.

Before JACKSON, P.J., and BENCH, and BILLINGS, JJ.

## OPINION

BILLINGS, Judge:

¶1 Autoliv ASP, Inc. (Autoliv) appeals from a decision of the Workforce Appeals Board (Board) granting Christopher Guzman and Thomas King unemployment benefits. Autoliv argues that Guzman and King were discharged for just cause and are thus ineligible for unemployment benefits. We agree and thus reverse and remand.

## BACKGROUND

¶ 2 Autoliv provides its over 6,000 employees with an employee handbook. The policies in the handbook that are relevant here include Autoliv's general rules of conduct, its anti-harassment policy, and its policy regarding computer usage.

¶ 3 Autoliv's general rules of conduct state:

Each employee is required to be familiar with these rules and with additional rules which apply to particular jobs and operations.... In addition, each employee is expected to maintain conduct consistent with job efficiency and accepted standards of behavior for a business environment. Deviation from those standards may be cause for disciplinary action.

*Disciplinary action may* be taken for violation of any single rule or combination of rules, or for other improper conduct or unsatisfactory performance, and may *include* any of the following actions: [1] Employee discussion; [2] Notice of Caution; [3] Involuntary Suspension; [4] *Termination ....*

. . . .

Failure of the company to enforce any rule does not excuse any employee from his or her responsibility to comply with the rule, nor will such failure alter the company's right to take disciplinary action thereafter.

(Emphasis added.)

¶ 4 Autoliv's anti-harassment policy stated that Autoliv would not "tolerate or permit illegal harassment or retaliation of any nature within our workforce." Autoliv's policy regarding the use of its computer system specifically prohibited, "[u]se of e-mail for reasons other than transmittal of business related information," and "[c]onduct that reflects unfavorably on the corporation."

¶ 5 In June 1998, Autoliv investigated problems it had experienced with the transmission of e-mail messages through its computer system because of excessive use. It was determined that non-business related messages were contributing to the problems. As a result, a company wide e-mail was sent explaining the problem and reiterating Autoliv's e-mail policy. The e-mail stated, "e-mail is to be used for business only. We do not wish to 'police' the e-mail system, so your cooperation would be appreciated. Please refrain from sending/receiving these types of messages as it is interfering with legitimate business e-mail."

¶ 6 In September 1998, Autoliv's Vice President of Human Resources sent another company wide e-mail which explained Autoliv's policy in more detail and included a warning that failure to adhere to the business only e-mail policy could result in termination.

¶ 7 In January 1999, Autoliv again reiterated its e-mail policy by sending out another company wide e-mail which stated that transmission of chain letters, jokes and stories, and non-business related announcements constituted improper use of the e-mail system. The message instructed employees, "If you receive an inappropriate E-mail, delete it and do not forward it to anyone." Finally, the message warned, "E-mail use is a benefit and abuse could lead to disciplinary action and/or termination."

¶ 8 Autoliv received a complaint from a former employee alleging that she had received offensive and sexually harassing e-mail from current Autoliv employees. Autoliv immediately began an investigation. The investigation revealed that several employees had violated Autoliv's e-mail policy by using e-mail for non-business related messages. Guzman and King were found to have violated the policy including the transmission of sexually oriented and offensive messages.[1]

¶ 9 Specifically, the investigation revealed that Guzman had sent eleven non-business related messages containing jokes, photos, and short videos that were sexually explicit and clearly offensive in nature. King had sent approximately twenty-five non-business related messages containing the same type of sexually explicit and offensive content.

¶ 10 Concerned about the quantity of non-business related e-mail messages and the

---

1. A third employee was also found to be significantly involved in abusing the policy and was terminated. However, her termination is not before us on appeal.

threat of sexual harassment lawsuits that could result from the sexual and offensive content of the messages, Autoliv terminated Guzman and King for "improper and unauthorized use of company e-mail." After unsuccessfully seeking reinstatement, Guzman and King filed applications for unemployment benefits with the Department of Workforce Services (Department). The Department found that Guzman and King had been discharged by Autoliv without just cause and thus found them eligible for benefits under section 35A–4–405(2)(a) of the Utah Employment Security Act (Act). *See* Utah Code Ann. § 35A–4–405(2)(a) (Supp.2000). Autoliv was found ineligible for relief of benefit charges under the Act. *See id.* § 35A–4–307(1) (Supp.2000). Autoliv appealed the decisions of the Department to an Administrative Law Judge (ALJ).

¶ 11 At the hearing before the ALJ, Guzman and King admitted to sending the e-mails. They testified that they had received Autoliv's handbook and were aware of the anti-harassment policy. They also testified they probably had received the three company wide e-mail messages about Autoliv's e-mail policy. However, they claimed they most likely deleted the e-mails before reading them. Thus, both claimants testified they were unaware their conduct could result in immediate termination and did not understand why they were not warned and allowed to change their conduct.

¶ 12 The ALJ upheld the decision of the Department. The ALJ concluded, "abuse of the company e-mail was common among employees, and the employer had an obligation to the claimant[s] to issue a specific warning, maybe even a suspension (not merely a memo) notifying the claimant[s] the conduct would not be tolerated."

¶ 13 Autoliv appealed the ALJ's decisions to the Workforce Appeals Board. The Board adopted the ALJ's findings of fact and, in a 2–1 decision, concluded that while Guzman and King were culpable, the element of "knowledge" was not present and thus there was no just cause for their discharge. The Board reasoned that Autoliv's strict written policy on e-mail use differed from its actual application of that policy. The Board con-

cluded that "[b]ecause of the difficulty of deciding when an employee's use of the e-mail becomes 'excessive' [Autoliv] had an obligation to notify the claimant that his e-mail use differed significantly in content and extent from that of his co-workers and that continuing to use the e-mail as he was doing would result in a discharge."

¶ 14 Autoliv appeals.

## STANDARD OF REVIEW

¶ 15 Autoliv does not contest the Board's underlying factual findings. Rather, Autoliv challenges the Board's application of the Employment Security Act to those facts. Because Autoliv does "not dispute the underlying material facts, the Board's decision 'calls for application of statutes and administrative rules to a specific factual situation.' " *SOS Staffing Servs., Inc. v. Workforce Appeals Bd.,* 1999 UT App 210,¶ 8, 983 P.2d 581 (quoting *Professional Staff Mgmt., Inc. v. Department of Employment Sec.,* 953 P.2d 76, 79 (Utah Ct.App.1998)).

¶ 16 "When we review an agency's application of the law to a particular set of facts, we give a degree of deference to the agency." *Professional Staff Mgmt.,* 953 P.2d at 79 (citing *Drake v. Industrial Comm'n,* 939 P.2d 177, 181 (Utah 1997)). "The degree of deference we accord an agency's application of law to fact is ordinarily determined by a 'sliding scale,' which hinges on policy concerns, the agency's expertise, and whether the issue is fact-driven or susceptible to uniform legal rules." *SOS Staffing Servs., Inc.,* 1999 UT App 210 at ¶ 8, 983 P.2d 581 (footnote omitted) (citing *Sierra Club v. Utah Solid & Hazardous Waste Control Bd.,* 964 P.2d 335, 341 (Utah Ct.App.1998); *Drake,* 939 P.2d at 181 n. 6, 182). "[B]ecause 'proper application of the Employment Security Act and the relevant rules "requires little highly specialized or technical knowledge that would be uniquely within the [Board's] expertise" ..., this court will review the agency's decision "with only moderate deference." ' " *Id.* (second alteration in original) (quoting *Professional Staff Mgmt.,* 953 P.2d at 79–80 (quoting *Allen v. Department of Employment Sec.,* 781 P.2d 888, 890 n. 4

(Utah Ct.App.1989))). Thus, we will " 'uphold [the Board's] decision so long as it is within the realm of reasonableness and rationality.' " *Buick v. Department of Employment Sec.,* 752 P.2d 358, 360 (Utah Ct.App. 1988) (quoting *Grinnell v. Board of Review,* 732 P.2d 113, 115 (Utah 1987)); *see also Albertsons, Inc. v. Department of Employment Sec.,* 854 P.2d 570, 573 (Utah Ct.App. 1993).

## JUST CAUSE TERMINATION

¶ 17 A claimant is ineligible for unemployment benefits if the claimant was discharged for "just cause." *See* Utah Code Ann. § 35A–4–405(2)(a) (Supp.2000). To establish "just cause," three elements must be present: culpability, knowledge, and control. *See Nelson v. Department of Employment Sec.,* 801 P.2d 158, 161 (Utah Ct.App.1990) (citing *Pro–Benefit Staffing v. Board of Review,* 775 P.2d 439, 442 (Utah Ct.App.1989)); Utah Code Admin. P. R994–405–202 (2000). The Board concedes the elements of culpability and control. Thus, the only issue is whether Guzman and King had " 'knowledge of the conduct which the employer expected.' " *Nelson,* 801 P.2d at 162 (quoting *Law Offices of D.P. White v. Board of Review,* 778 P.2d 21, 24 (Utah Ct.App.1989)).

¶ 18 There are two ways to establish that a claimant had knowledge: (1) the employer must have provided a clear explanation of the expected behavior or a written policy regarding the same; or (2) "the conduct involved is a 'flagrant violation of a universal standard of behavior.' " *Id.* (quoting *Law Offices of D.P. White,* 778 P.2d at 24); *see also* Utah Code Admin. P. R994–405–202(2) (2000).

¶ 19 Autoliv, before the Board and on appeal, relies on both alternatives to establish knowledge. The Board focused only on the first alternative in its analysis, concluding that because the written policy against excessive e-mail was not consistently enforced the claimants had no knowledge of the expected conduct.[2] We would normally reverse and remand to allow the Board to consider the second alternative: whether the claimants,

by repeatedly sending sexually explicit and offensive e-mails, violated a universal standard of behavior. However, our review of the record persuades us that the claimants' conduct violated a universal standard of behavior and any other determination would be unreasonable.

¶ 20 Autoliv need not establish "knowledge" with a clear explanation or written policy and consistent enforcement of that policy if Guzman and King's conduct was "a flagrant violation of a universal standard of behavior." *Nelson,* 801 P.2d at 162 (quotation and citation omitted); *see also* Utah Code Admin. P. R994–405–202(2) (2000). "Serious violations of universal standards of conduct may not require prior warning to support disqualification." Utah Code Admin. P. R994–405–208(1)(e) (2000).

¶ 21 Utah's appellate courts have only once determined whether the conduct of an employee constituted "a flagrant violation of a universal standard of behavior." In *Bhatia v. Department of Employment Security,* 834 P.2d 574 (Utah Ct.App.1992), we upheld the Board of Review of the Industrial Commission's conclusion that an employee's "behavior in angrily walking off the job in the middle of a busy shift at a crucial time for the employer's business, leaving others to assume his responsibilities, and his use of vulgarity within the hearing of customers was 'a flagrant violation of a universal standard of behavior.' " *Id.* at 580 (citation omitted). In *Bhatia,* the employee argued that he did not have sufficient knowledge of his employer's expectations for purposes of establishing "just cause" because he was not warned "he would be discharged for using vulgarity and leaving work during a busy shift." *Id.* at 579–80. We found this argument unpersuasive. Because the employee's conduct violated a universal standard of behavior, lack of a specific warning did not preclude a finding that he had "knowledge of the conduct which the employer expected." *See id.* at 579–80.

¶ 22 Other courts agree that there is a minimum level of behavior an employer has a right to expect from its employees and thus

---

**2.** We do not reach this issue on appeal as we    reverse on an alternative issue.

the employer need not specifically communicate that expectation. In *Pimley v. Best Values, Inc.*, 132 Idaho 432, 974 P.2d 78 (Idaho 1999), the Idaho Supreme Court affirmed the denial of unemployment benefits to a claimant holding, "an employer may reasonably expect that employees not use vulgar language in the presence of other employees and customers during business hours in a retail establishment, particularly where the vulgarities show disrespect for the employer and its management." *Id.* at 81.

¶ 23 In *Oaster v. Unemployment Compensation Board of Review*, 705 A.2d 507 (Pa. Commw.Ct.1998), the claimant was discharged for using company e-mail to send personal messages and to criticize management. *See id.* at 508. The court affirmed the denial of benefits to the claimant, reasoning that the claimant's conduct, which included threats not to perform her work, undermined her employer and thus disregarded the "standards of behavior which an employer can rightfully expect from [its] employees." *Id.* at 509.

¶ 24 *Caterpillar, Inc. v. Department of Employment Security*, 313 Ill.App.3d 645, 246 Ill.Dec. 472, 730 N.E.2d 497 (2000), involved the stalking and sending of unwanted e-mails to a specific co-worker. *See id.*, 246 Ill.Dec. at 474, 730 N.E.2d at 499. In denying the discharged harasser benefits, the court stated, " '[t]he employer is not required to prove the existence of a reasonable rule or policy by direct evidence, but the court may reach that determination by a commonsense realization that certain conduct intentionally and substantially disregards an employer's interests.' " *Id.*, 246 Ill.Dec. at 480, 730 N.E.2d at 505 (citation omitted).

¶ 25 Autoliv asserts that, in this day and age of sexual harassment lawsuits, it is "incomprehensible" for the Board to hold that a worker could be unaware of the dangers of having sexually offensive materials, including videos depicting sexual acts, sent between co-workers in a company's computer network. We agree. The Board in its opinion states the "content of the materials was sexually explicit and offensive. Such material in the workplace could have subjected the employer to sexual harassment claims." This finding in our view supports a conclusion that the claimants' conduct violated a universal standard of behavior.

¶ 26 E-mail transmission of sexually explicit and offensive material such as jokes, pictures, and videos, exposes the employer to sexual harassment and sex discrimination lawsuits.[3] As the Utah Supreme Court stated in *Retherford v. AT & T Communications of the Mountain States, Inc.*, 844 P.2d 949 (Utah 1992), "our society has ceased seeing sexual harassment in the work place as a playful inevitability that should be taken in good spirits and has awakened to the fact that sexual harassment has a corrosive effect on those who engage in it as well as those who are subjected to it." *Id.* at 978.[4]

¶ 27 We conclude that in today's workplace, the e-mail transmission of sexually explicit and offensive jokes, pictures, and

---

3. *See, e.g., Greenslade v. Chicago Sun –Times, Inc.*, 112 F.3d 853, 864 (7th Cir.1997) (noting excessive number of e-mails sent to female co-worker both purposefully and inadvertently as possible grounds for sexual harassment); *Yamaguchi v. U.S. Dep't of the Air Force*, 109 F.3d 1475, 1478 (9th Cir.1997) (involving Title VII sexual harassment claim based on inappropriate jokes and comments sent through e-mail by co-worker); *Strauss v. Microsoft Corp.*, 814 F.Supp. 1186, 1194 (S.D.N.Y.1993) (involving sex discrimination claim against employer supported in part by e-mails sent by supervisor which contained sexually explicit messages and innuendo); *Opp v. Source One Mgmt.*, 591 N.W.2d 101, 104 (N.D.1999) (involving sexual harassment claim against employer on grounds that supervisor sent a large number of cards, notes, and e-mails containing sexual innuendos). The potential for liability is increased by the fact that this material can be viewed inadvertently by others as it is displayed on a computer screen, *see Board of Educ. v. Grundfest*, 2000 N.J. AGEN LEXIS 205, 1 at *5 (involving teacher who allowed pornographic images on his computer screen to be viewed by a student), or can be inadvertently sent to other than the intended recipient. *See Olivant v. Department of Envtl. Prot.*, OAL Dkt. No. CSV 10916–95 (N.J. Admin. April 12, 1999) (involving employee who inadvertently e-mailed inappropriate jokes to 400–500 other employees).

4. King recognized the potential harm in his e-mails by writing in one of them, "When I send you things please be very discrete about it before showing anyone. [S]ome of the things I get is [sic] a little risque for most viewers and I do like my job a little."

videos constitutes a flagrant violation of a universal standard of behavior. Therefore, we reverse the Board's decision and remand to the Board to enter a decision consistent with our opinion.

¶ 28 WE CONCUR: NORMAN H. JACKSON, Associate Presiding Judge, and RUSSELL W. BENCH, Judge.