VOROS, Associate Presiding Judge
(dissenting):
120 I respectfully dissent. In my judgment, it is unreasonable to conclude that Claimant Wade Marinoni was not culpable and that his conduct here did not violate a universal standard of conduct.
121 The following facts are undisputed. At a doctor's request, Nurse Lex Black called the Carbon County Ambulance Garage to request a STAT transport. Marinoni answered the call and asked, "Why the STAT transport?" Black replied that "[the patient was having an active MI with ongoing chest pain and Dr. Frischknecht ... wanted the patient in the cath lab [in Provol ASAP." "MI" means "myocardial infaretion." A myocardial infarction is a heart attack. See Mayo - Clinic, - http://www.mayoclinic.com/ health/heart-attack/D800094 - (last - visited Dec. 14, 2011); National Institutes of Health, http://www.nIm.nih.gov/medlineplus/encey/ article/000195.htm (last visited Dee. 14, 2011); Merriam-Webster, - Medical, - http://www. merriam-webster.com/medical/myocardial% 20infarction (last visited Dec. 14, 2011). Notwithstanding this clear request, and supporting information as to its source and rationale, Marinoni neither performed a STAT transport nor requested to speak with the doctor. When asked why not, he testified, "I really didn't get the impression from [the nurse] that it was that urgent of a call. And then when I told him I would go ahead and fill it, he stated that was okay."
22 Marinoni's misconduct did not end at that point, however. He ended up driving the patient to Provo. The other two EMTs in the ambulance with Marinoni and the patient on that drive described his conduct on the trip.[1] According to these EMTs, Marino-ni told one of them, "Get your ass in[,] I'm driving."[2] He "slammed the ambulance into gear and whip[ped] the ambulance out of the hospital parking lot," throwing the patient and the two EMTs around in the back. The patient complained that the driving made the pressure on her chest worse. Once they were on the highway, the other two EMTs checked the speedometer; one said Marinoni was driving between 90 and 95 miles per hour, the other said he was driving between 95 and 100 miles per hour.[3] Finally, one of the EMT's told Marinoni, "Slow down before you kill us."[4] According to one of the EMTs, Marinoni then slowed to 60 or 65 *979 miles per hour "and did not go any faster with a critical [patient]." [5]
I 23 I believe that Marinoni was terminated for just cause because this conduct violated a universal standard of conduct. The employer "has the burden to prove there was just cause for discharging the claimant," Utah Admin. Code R994-405-208, which is established if three elements are met: culpability, knowledge of expected conduct, and control over the offending conduct, see id. R994-405-202; Autoliv ASP, Inc. v. Department of Workforce Servs., 2001 UT App 198, ¶ 17, 29 P.3d 7. "Generally, knowledge may not be established unless the employer gave a clear explanation of the expected behavior or had a written policy, except in the case of a violation of a universal standard of conduct." Utah Admin. Code R994-405-202(2). "Serious violations of universal standards of conduct do not require prior warning to support a disqualification." - Id. R994-405-208(1)(e).
24 Violations of a universal standard of conduct are admittedly rare. But our cases establishing such violations are instructive. In Smith v. Workforce Appeals Board, 2011 UT App 68, 252 P.3d 372, the parties agreed that for an employee to drive a company car on a suspended license violates a universal standard of conduct. See id. ¶ 12. In Martin v. Department of Workforce Services, 2004 UT App 264U, 2004 WL 1752833 (mem.), we approved the Board's determination that "it is inconceivable that [the employee] would have been unaware of the dangers associated with using [her employer's email] network to e-mail photographs of naked men." - Id. at para. 6. And in Bhatia v. Department of Employment Security, 834 P.2d 574 (Utah Ct.App.1992), we approved the Board's determination that a pizza restaurant employee who "swore loudly enough for customers to hear and walked off his shift, putting the employer in a serious bind and possibly offending customers" violated a universal standard of conduct. Id. at 579-80 (internal quotation marks omitted).
125 Autoliv ASP, Inc. v. Department of Workforce Services, 2001 UT App 198, 29 P.3d 7, is especially relevant because there we set aside the Board's decision that an employee did not have knowledge of the conduct expected of him. See id. 125. In this pre-Martin case, two employees sent coworkers non-business-related emails "containing jokes, photos, and short videos that were sexually explicit and clearly offensive in nature." - Id. 1 9. We found it " 'incomprehensible' for the Board to hold that a worker could be unaware of the dangers of having sexually offensive materials, including videos depicting sexual acts, sent between co-workers in a company's computer network." Id. 11 25.
126 Marinoni's conduct was at least as flagrant as the conduct in these cases. The core question here is not complicated. When a patient experiencing an active heart attack needs to be moved, who should decide whether the situation is sufficiently urgent to require a STAT transport: the treating physician, the nurse, or the ambulance driver? I frankly find it inconceivable that, however many people were asked that question, even a single one would choose the ambulance driver. Accordingly, I fail to see how Mari-noni could have lacked knowledge that his conduct was inappropriate.
T 27 The existence of culpability is at least as obvious. To establish culpability, "[the conduct causing the discharge must be so *980 serious that continuing the employment relationship would jeopardize the employer's rightful interest." Utah Admin. Code R994-405-202(1). Measuring the jeopardy to the employer's rightful interest "require[s] a balancing of the employee's past work record, the employee's length of employment, and the likelihood the conduct will be repeated against the seriousness of the offense and the harm to the employer." (Gibson v. Department of Emp't Sec., 840 P.2d 780, 784 (Utah Ct.App.1992).
128 In Martin, we approved the Board's determination that, although no one even complained about the employee's emails of naked men, "the very real possibility remained that someone would." 2004 UT App 264U, para. 10, 2004 WL 1752833 (mem.). In Bhatia, we approved the Board's determination of culpability where the restaurant employee's vulgarity "possibly" offended customers and his "unauthorized departure in the middle of a busy shift placed unexpected pressure on the restaurant staff." 834 P.2d at 579. In Autoliv, we agreed with the Board's conclusion that sexually explicit and offensive emails in the workplace "could have subjected the employer to sexual harassment claims." 2001 UT App 198, ¶ 25, 29 P.3d 7.
1 29 Without minimizing the dangers posed by the possibility that a coworker might complain about or even sue over offensive emails, or that an employee's vulgarity might be overheard by customers, or that his abrupt departure would leave his coworkers in a bind during a busy shift, the potential harm here is of a different and altogether more serious order. At stake was not merely loss of customers or loss of money, but loss of life. This potential harm outweighs other culpability factors and renders the Board's determination unreasonable.
130 Finally, unlike the majority, I do not believe that the Board's failure to enter findings on key facts precludes appellate review. The absence of findings on a critical issue "is an error that usually requires a remand for the purpose of allowing the trial court to make such findings." Flying Diamond Oil Corp. v. Newton Sheep Co., 776 P.2d 618, 622 (Utah 1989). "However, a remand is not necessary if the evidence in the record is undisputed and the appellate court can fairly and properly resolve the case on the record before it." Id.
31 Indeed, in Autoliv, this court reversed the Board on the ground that the employee's behavior violated a universal standard of conduct notwithstanding the Board itself had "focused only on the [employer policy] alternative in its analysis." Autoliv ASP, Inc. v. Department of Workforce Servs., 2001 UT App 198, ¶ 19, 29 P.3d 7. "We would normally reverse and remand to allow the Board to consider the [universal standard] alternative," we stated. Id. "However," we continued, "our review of the record persuades us that the claimants' conduct violated a universal standard of behavior and any other determination would be unreasonable." Id. I would follow this course here, especially where the facts demonstrating Marinoni's violation of a universal standard of conduct were either not controverted (with respect to his failure to respond to the initial request for a STAT transport) or not seriously controverted (with respect to his driving).[6]
1 32 For the foregoing reasons, I would set aside the Board's determination on the ground that it exceeds the limits of reasonableness.

. Their accounts were uncontroverted except as noted in the footnotes.

. Marinoni later testified that he did not remember exactly what he said to this EMT.

. Marinoni later testified that he didn't recall how fast he was driving; he also testified, "I don't think I was going 90-95 miles an hour."

. - Marinoni later testified that all he remembered her saying was that he needed to slow down.

. In reciting the foregoing facts, I have not, as stated by the majority opinion, "deive[d] into the record to determine whether the [Board's] finding was supported by sufficient evidence." Supra 1 10 n. 5. Nor did locating these facts require "searching the record for facts that the Board did not find and the parties did not argue...." Id. I1 have merely quoted the evidence upon which the Board relied in finding that "another employee complained that [Marinoni] was driving too fast so he slowed down." This evidence appears on two pages of the record, which are cited in Carbon County's opening brief. Admittedly, that brief does not quote "the specific statements made by other EMTs," Supra 110 n. 5, but it does summarize them. Marinoni's driving was also discussed in oral argument. Accordingly, the majority's reference to State v. Robison is inapt. See State v. Robison, 2006 UT 65, ¶¶ 22-25, 147 P.3d 448 (reversing the court of appeals for reversing the trial court "on a legal theory that had not been preserved, briefed, or argued"). In any event, while Marinoni's driving was disturbingly unprofessional, I would reverse even if it had been exemplary.

. In addition, like the employer in Autoliv, Carbon County preserved this issue before the Board. See 2001 UT App 198, 119, 29 P.3d 7.