**2014 UT App 231**

## THE UTAH COURT OF APPEALS

BENJAMIN J. HANSEN,
Petitioner,
*v.*
DEPARTMENT OF WORKFORCE SERVICES, WORKFORCE
APPEALS BOARD,
Respondent.

Opinion
No. 20130614-CA
Filed October 2, 2014

Original Proceeding in this Court

Wilford N. Hansen Jr., Attorney for Petitioner

Amanda B. McPeck, Attorney for Respondent

JUDGE JAMES Z. DAVIS authored this Opinion, in which JUDGES
GREGORY K. ORME and JOHN A. PEARCE concurred.

DAVIS, Judge:

¶1      Benjamin J. Hansen contests the Workforce Appeals Board's
(the Board) determination upholding the Department of Workforce
Services' (the Department) decision denying him unemployment
benefits and assessing a fault overpayment against him. We do not
disturb the Board's decision denying benefits in connection with
Hansen's termination of employment with Tucanos Brazilian Grill
(Tucanos), but we set aside the Board's determination that Hansen
was not entitled to receive benefits between January and March
2013 in connection with his earlier termination of employment with
Becden Dental Laboratory (Becden) and the Board's overpayment
assessment.

BACKGROUND

¶2      Hansen was employed by Becden as a dental technician for nine and a half years. While employed by Becden, Hansen attended school at Utah Valley University. In March 2012, Hansen was laid off by Becden and filed a claim for unemployment benefits. Hansen's claim was granted, and the Department also granted him a training exemption, which permitted him to collect unemployment benefits while attending school without requiring him to search for work.[1] *See* Utah Code Ann. § 35A-4-403(2)(b)(i) (LexisNexis Supp. 2013); Utah Admin. Code R994-403-202. Department approval of his exemption was extended through March 2013.

¶3      Despite being exempt from seeking work due to his schooling, Hansen obtained part-time employment as a server at Tucanos in July 2012. Hansen continued to collect unemployment benefits while working for Tucanos, though his benefit payment was occasionally reduced when his Tucanos earnings exceeded 30% of his benefit amount. *See generally* Utah Code Ann. § 35A-4-401(3) (LexisNexis Supp. 2013). Hansen worked for Tucanos through the end of December 2012. Anticipating a busy school schedule during the spring semester of 2013, Hansen requested that he be removed from the regular schedule at Tucanos beginning in January 2013 and be permitted to "pick up" shifts for other servers based on his availability. The management at Tucanos did not directly respond to this request, but Hansen was taken off the schedule beginning the first week of January 2013. Although

---

1. When a student has been approved for a training exemption, his or her "satisfactory attendance and progress in school serves as a substitute for the availability requirements of the [Employment Security Act]." Utah Admin. Code R994-403-204(1). *See generally* Utah Code Ann. § 35A-4-403(1)(b)–(c) (LexisNexis Supp. 2013) (requiring that "during each and every week for which [a claimant makes] a claim for benefits" the claimant make a "good faith effort to secure employment," be "able to work," and be "available for work").

Hansen intended to pick up shifts for other employees using Tucanos's computerized scheduling system, it soon became apparent that he had been locked out of the system.

¶4 Hansen continued to regularly socialize with several "lower managers" of Tucanos. He asked them why he could no longer access the system and indicated that he still wished to pick up shifts for other servers. The managers told him they would try to find out what happened, but they did not get back to him. Because he was busy with school, Hansen did not aggressively seek an answer to why he had been locked out of the scheduling system and did not meet with his direct supervisor about the issue until the beginning of March 2013. Hansen never attempted to contact the general manager about the issue. Between January and March 2013, Hansen continued to collect the Becden-related unemployment benefits for which he had already been approved. When Hansen spoke with his supervisor in March, the supervisor informed him that Tucanos believed he had quit. Just prior to being taken off the schedule, Hansen had purchased new clothes and a knife in anticipation of his continued employment with Tucanos, and when Hansen spoke to his supervisor in March, he informed the supervisor that he would still like to work at Tucanos. Nevertheless, he was not permitted to resume working.

¶5 Also in March 2013, Hansen's unemployment benefits stemming from his employment with Becden were scheduled to run out. He therefore filed a new claim based on his termination from employment with Tucanos. On his application, Hansen claimed that the reason for his termination was a "[r]eduction in force." Hansen's supervisor disputed Hansen's claim and represented that Hansen had voluntarily quit because he "wanted a reduction in hours." The Department denied Hansen's claim because it determined that he quit without good cause in order to attend school. *See* Utah Admin. Code R994-405-107(4) (providing that school attendance does not constitute good cause to quit a job). The Department also informed him that he became ineligible to receive benefits as of January 20, 2013, the approximate date his employment with Tucanos ended. Subsequently, the Department informed Hansen that he had received an overpayment of benefits

in the amount of $2,855 for the period of January 20, 2013, through March 30, 2013, and that he was required to repay that amount to the Department.[2]

¶6      Hansen appealed the Department's decision to deny his claim and its decision to assess an overpayment. Following a hearing, an administrative law judge (the ALJ) upheld both of the Department's determinations. Hansen appealed this decision to the Workforce Appeals Board. The Board determined that Hansen "voluntarily quit in order to focus on his schooling," which Department rules do not consider to be good cause to leave employment. *See id.*; *see also* Utah Code Ann. § 35A-4-405(1)(a) (LexisNexis Supp. 2013) (providing that leaving "work voluntarily without good cause" makes an individual "ineligible for benefits"). The Board further determined that Hansen's decision made him ineligible for the Department's training exemption as of January 20, 2013, the date he "was fully aware he was unable to bid for shifts, yet failed to contact the general manager about the problem." The Board explained,

> Any separation from employment is potentially disqualifying, whether the separation occurs before or after the original claim is filed. Disqualifying separations are not limited to separations from base period employers. The Claimant is correct that he

---

2. The benefits for which Hansen was assessed an overpayment were the Becden-related benefits he collected after he quit working at Tucanos but before the training exemption expired. Although the Board relieved Tucanos of charges assessed for benefits paid to Hansen, it does not appear that Hansen was ever paid any benefits in connection with his Tucanos employment because the Department denied his Tucanos-related claim, which was not even filed until after Hansen stopped receiving benefits. *See generally* Utah Admin. Code R994-403-101a(2) ("The effective date of a new claim for benefits is the Sunday of the week in which the claim is filed . . . . A claim for benefits can only be made effective for a prior week if the claimant can establish good cause for late filing . . . .").

was not required to seek employment after he received Department approval for his schooling. However, once he accepted a job, and subsequently chose to voluntarily quit that job, the Department was required to redetermine his eligibility as of the week that he voluntarily quit.

Hansen requests that we set aside the Board's decision.

ISSUES AND STANDARDS OF REVIEW

¶7     Hansen asserts that the Board erred in finding that he voluntarily quit his employment with Tucanos. He further argues that even if he did quit, the Board erred in determining that the quit made him ineligible for the ongoing training exemption, which relates back to the termination of his Becden employment. Both of these issues present mixed questions of law and fact because they involve the "application of a legal standard to a set of facts unique to [this] particular case." *See Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 24, 308 P.3d 461 (citation and internal quotation marks omitted). Mixed questions may be reviewed either deferentially or nondeferentially, depending on whether the question is more fact-like or more law-like. *Id.* ¶¶ 36–39.

¶8     The question of whether Hansen voluntarily quit is fact-like because "[d]ue to the fact-intensive inquiry involved at the agency level, . . . the appellate court would be in an inferior position to review the correctness of the decision." *Carbon County v. Workforce Appeals Bd.*, 2013 UT 41, ¶ 7, 308 P.3d 477 (omission in original) (citation and internal quotation marks omitted); *see also Carnagie v. Workforce Appeals Bd.*, 2013 UT App 193, ¶¶ 6, 9, 308 P.3d 561 (granting deference to the Workforce Appeals Board's determination that a claimant voluntarily quit his job). We will therefore uphold the Board's determination if it is supported by substantial evidence. *See Professional Staff Mgmt., Inc. v. Department of Emp't Sec.*, 953 P.2d 76, 80 (Utah Ct. App. 1998). The question of whether Hansen's decision to quit working for Tucanos made him ineligible for the training exemption, on the other hand, is law-like

and warrants nondeferential review because it requires us to interpret statutory and administrative rules relating to the exemption and "lend[s] itself to consistent resolution." *See Murray*, 2013 UT 38, ¶ 37 (citation and internal quotation marks omitted).

ANALYSIS

I. The Board's Finding That Hansen Voluntarily Quit Is Supported by Substantial Evidence.

¶9     Hansen argues that "the clear weight of the evidence" indicates that his termination from Tucanos was involuntary. "A separation is considered voluntary if the claimant was the moving party in ending the employment relationship. A voluntary separation includes . . . failing to return to work after . . . a period of absence initiated by the claimant." Utah Admin. Code R994-405-101(1). Here, Hansen requested that he be taken off the schedule and allowed to "pick up" shifts. The management did not respond to his request, but Hansen soon discovered that he had been locked out of the online scheduling system. Despite this discovery, Hansen made no serious effort to resolve the problem; although he mentioned the issue to lower managers when he met with them socially, he did not contact his immediate supervisor for approximately two months and made no attempt to contact the general manager. The Board found that Hansen "failed to bid for any shifts and failed to contact [Tucanos] in a timely manner once he realized he was unable to access the scheduling system." The Board explained, "If the Claimant truly wished to continue working for [Tucanos], he would have contacted the general manager immediately in January 2013." Based on these findings, the Board concluded that "the separation [was] a voluntary quit." The Board's findings were supported by substantial evidence, and its findings support its determination that Hansen voluntarily quit.

¶10     Hansen also argues that it was against equity and good conscience to deny him benefits because he "reasonably tried to maintain his employment at Tucanos." *See* Utah Code Ann. § 35A-4-405(1)(b)–(c) (precluding denial of benefits where doing so would

be "contrary to equity and good conscience" and explaining that such a determination is based on "the reasonableness of the claimant's actions"). However, even if Hansen subjectively intended to keep working for Tucanos, it was unreasonable of him not to timely communicate with Tucanos about problems he was having picking up shifts. And it was reasonable for Tucanos to assume that Hansen did not intend to return to work when it did not hear from him for two months. Thus, the Board did not err in determining that denying Hansen benefits was not against equity and good conscience.

## II. The Board Erred in Determining That Hansen Became Ineligible for the Training Exemption by Quitting His Job at Tucanos.

¶11    Hansen next asserts that the Board erred in determining that he became ineligible for the training exemption when he quit working at Tucanos. Utah Code section 35A-4-403 provides, "An individual in training with the approval of the division is not ineligible to receive benefits by reason of nonavailability for work, failure to search for work, refusal of suitable work, [or] failure to apply for or to accept suitable work . . . ." Utah Code Ann. § 35A-4-403(2)(b)(i) (LexisNexis Supp. 2013). Although the Department had approved Hansen's training exemption through March 2013, the Board determined that "once he accepted a job, and subsequently chose to voluntarily quit that job, the Department was required to redetermine his eligibility as of the week that he voluntarily quit." Because one of the requirements for obtaining a training exemption is that the claimant not have left work in order to attend school, the Board argues that Hansen's decision to quit his part-time job at Tucanos in order to devote more time to school made him ineligible for the training exemption. *See* Utah Admin. Code R994-403-202(8). There are a number of flaws in this argument.

¶12    First, no provision of the Utah Code or the Utah Administrative Code (UAC) suggests that the Department is required to reassess eligibility for a training exemption when an employee quits a job he was never required to hold in the first place. In fact, provisions of the UAC suggest otherwise. Although

the UAC provides that "[g]ood cause [to quit a job] is not established if a claimant refuses suitable work because the work will interfere with school or training," the same provision clarifies that "[c]laimants attending school full-time with Department approval are not required to seek work." *Id.* R994-405-310(4). The UAC's inclusion of these two statements within the same provision suggests that a training exemption excusing a claimant from seeking work also excuses the claimant from quitting subsequently-obtained employment that interferes with school or training. In other words, once the Department has determined that a claimant is eligible for the training exemption, in part because he did not leave his previous employment for the purpose of attending school, the claimant's decision to quit new, temporary work during the time he is subject to the training exemption does not affect his eligibility for the exemption.[3]

¶13    Second, the Board's position is logically inconsistent with other provisions of the UAC. The UAC requires claimants that have been approved for a training exemption to continue seeking temporary work "prior to the onset of training, even if the claimant has been advised that the training has been approved," and during school breaks lasting longer than four weeks. *Id.* R994-403-108b(1)(f); *see also id.* R994-403-112c(6). By the Board's logic, claimants who comply with the UAC by obtaining temporary work prior to beginning school or during long breaks from school would

---

3. We do not disagree with the Board's assertion that "[d]isqualifying separations are not limited to separations from base period employers." Had Hansen been required to seek and maintain suitable employment, and assuming that his employment with Tucanos was suitable, his decision to quit could have disqualified him for benefits regardless of the fact that the benefits initially stemmed from his Becden termination. However, Hansen was not required to seek employment because the Department had approved his training exemption. Thus, the fact that the training exemption stemmed from Hansen's termination from Becden rather than his termination from Tucanos is relevant to the question of whether he impermissibly quit work in order to attend school.

lose their eligibility for the training exemption when they quit their temporary work to resume school, since they would technically be "leav[ing] work to attend school." *Id.* R994-403-202(8). It would make no sense for the Department to approve a training exemption, require the claimant to seek temporary work prior to beginning school, and then, once the claimant has found temporary work, require the claimant to continue working indefinitely in order to maintain his eligibility for the training exemption. Indeed, the UAC specifically provides that "[o]nce the claimant is actually in training, benefits will not be denied when work is refused as satisfactory attendance and progress in school serves as a substitute for the availability requirements of the [Employment Security Act]." *Id.* R994-403-204(1). Thus, so long as Hansen continued meeting school attendance and progress requirements, his decision to refuse continued employment at Tucanos should have had no effect on his eligibility to continue receiving Becden-related benefits pursuant to the training exemption through March 2013.[4]

¶14    Third, the Department's actions suggest that Hansen's employment with Tucanos was irrelevant to his eligibility for the training exemption. The Department approved Hansen's training exemption in September 2012 and extended the exemption in December 2012 even though Hansen was already working at Tucanos. There is nothing to suggest that the Department conditioned Hansen's eligibility on his continued employment with Tucanos. To the contrary, in its letter approving the extension, the Department explicitly informed Hansen, "Your attendance at school fulfills the availability for work requirement. You do not have to look for work or accept offered work while in approved training." Furthermore, despite the fact that Hansen worked no hours at Tucanos between January and March 2013, the Department continued to approve his weekly benefit claims. If

---

4. The Board's statement that "a reasonable person in [Hansen's] circumstances would have chosen to take fewer classes so he could maintain his work schedule" is also contradictory because Hansen was required to attend school full time in order to maintain his training exemption. *See* Utah Admin. Code R994-403-204(4).

continuing to work at Tucanos was a prerequisite for continuing to receive benefits, then Hansen's report that he had not worked during the weeks in question should have alerted the Department to his ineligibility before Hansen ever filed his Tucanos unemployment claim.[5] In short, Hansen could not reasonably have known that his eligibility for the training exemption hinged on his continuing to work for Tucanos.

¶15　Finally, there are public policy reasons for rejecting the Board's position. Hansen, despite not being required to seek employment as a condition of receiving benefits in connection with his separation from Becden, obtained a part-time job to supplement—and to some degree, replace—his unemployment benefits during a semester when his school schedule allowed him to do so. Then, when his school schedule no longer permitted the same time commitment to a part-time job, Hansen was penalized for his previous efforts and held to a higher standard than other claimants subject to the training exemption. As a matter of public policy, claimants subject to the training exemption should not be discouraged from pursuing part-time employment when they are reasonably able to do so by a policy that requires them to maintain such employment indefinitely at the risk of losing their eligibility for benefits.

¶16　In sum, because the Department had approved Hansen for a training exemption and he was not required to seek or maintain

---

5. The Board faulted Hansen for failing to report his separation from Tucanos when filing his weekly benefits claim. However, even if Hansen did not report an official separation from Tucanos, it should have been clear to the Department that he was not earning any income from Tucanos. We can see no reason why Hansen should lose his eligibility for the training exemption by officially severing ties with Tucanos but maintain his eligibility by remaining an official employee of Tucanos but not working or earning any money. There is simply no practical difference between these two circumstances; either way, Hansen would be collecting unemployment benefits without working or seeking work.

employment as a condition of receiving benefits through March 2013, Hansen's employment with Tucanos and his decision to quit working for Tucanos had no impact on his eligibility for benefits stemming from his termination from Becden. Accordingly, the Board erred in determining that Hansen was ineligible for benefits between January and March 2013 and in assessing an overpayment against him.[6]

CONCLUSION

¶17    We decline to set aside the Board's decision upholding the Department's denial of Hansen's claim for unemployment benefits in connection with his Tucanos employment because its finding that Hansen's termination was voluntary is supported by substantial evidence. However, we agree with Hansen that the voluntary termination of his employment with Tucanos did not make him ineligible for the training exemption or to continue receiving Becden-related benefits as previously approved by the Department. We therefore set aside the Board's determination that Hansen was ineligible for the training exemption and its assessment of an overpayment against Hansen.

––––––––––

6. Because we determine that Hansen was not required to accept or maintain employment while subject to the training exemption, we need not consider Hansen's arguments regarding the suitability of his Tucanos employment, his availability for work, his ability to repay the overpayment, or the constitutionality of the Department's actions.